KC
FILED
JANUARY 10, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

08 C 236

RECYCLED PAPER GREETINGS, INC., an Illinois Corporation,

Plaintiff,

v.

KATHY DAVIS,

Defendant.

Case No.

JUDGE BUCKLO
MAGISTRATE JUDGE DENLOW

**VERIFIED COMPLAINT FOR INJUNCTIVE AND**
**OTHER RELIEF AND JURY DEMAND**

**Introduction**

This action arises out of the defendant's decision to terminate an uninterrupted seventeen-year business and contractual relationship with the plaintiff and immediately "jump ship" to one of the plaintiff's prime competitors in the greeting card business, American Greetings, announcing her intention to disclose to and pursue with American Greetings *a highly confidential and proprietary business venture recently entered into between plaintiff and one of its largest customers*. The defendant's actions, moreover, follow her purposefully leading the plaintiff to believe that she intended to continue under her contract, and after the plaintiff undertook with the defendant a significant joint venture marketing initiative; the same initiative which plaintiff now intends to deliver and/or disclose wholesale to American Greetings.

Plaintiff therefore brings this action for: misrepresentation; breach of contract; breach of the implied covenants of good faith and fair dealing; breach of fiduciary duties; promissory estoppel; and violation of the Illinois Trade Secrets Act. For the reasons detailed below,

defendant's actions have caused and will continue to cause irreparable harm and damages to the plaintiff.

1. By this action, the plaintiff therefore seeks to: (a) restrain the defendant and all persons acting in concert with the defendant from further unlawful conduct; (b) recover damages caused by the defendant's unlawful actions; and (c) pursue other common law and statutory claims against the defendant.

**The Parties**

2. Plaintiff Recycled Paper Greetings, Inc. ("RPG") is an Illinois corporation with its principal place of business at 111 N. Canal Street, Suite 700, Chicago, Illinois 60606.

3. Defendant Kathy Davis ("Davis") is a resident of the Commonwealth of Pennsylvania, residing at 1045 Limekiln Pike, Ambler, Pennsylvania, 19002. Davis has conducted business with RPG in her individual capacity and, at various times, using the d/b/a "Kathy Davis Designs" and/or "Kathy Davis Studios."

**Jurisdiction and Venue**

4. This Court has personal jurisdiction over Davis because she transacts business in Illinois, and has breached and will continue to breach contractual and fiduciary obligations to RPG in Illinois. Subject matter jurisdiction exists under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and Davis and RPG are citizens of different states.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the claim substantially arises out of incidents or events occurring in this judicial district.

**Statement of Facts**

6. RPG is in the business of selling greeting cards and was founded in 1971.

7. The original business concept was to introduce greeting cards on 100% recycled paper and thereby persuade consumers and the card industry generally to accept the environmental wisdom of using recycled paper for greeting cards. The "industry giants" are RPG's two main competitors, Hallmark and American Greetings, which together dominate the greeting card industry.

8. Over the course of thirty-plus years, RPG has grown to become the number three greeting card company, although its market share remains small compared to the industry giants. RPG's success is derived from its use of independent artists, whose original designs are the lifeblood of the company.

9. Davis is an artist in the business of designing and creating greeting cards.

10. Beginning in 1990, Davis and RPG established and have maintained a mutually-beneficial business relationship whereby Davis licenses her work to RPG and RPG sells cards created by Davis. As Davis' own website boasts, "[h]er success with Recycled Paper Greetings has blossomed and today she ranks as their number one selling non-humor artist."

11. Davis' website claim is accurate: over the years, RPG invested a significant amount of time, effort and money in promoting, establishing and maintaining the Kathy Davis brand. As a result, Davis' cards now constitute a significant portion of RPG's portfolio.

12. As discussed more fully below, RPG's relationship with Davis is governed by contract, and RPG has certain rights, arising from that contract, to the exclusive use of Davis' artwork and designs.

13. Consequently, RPG has a legitimate interest in protecting its contractual and business relationship with Davis.

**The Signature Collection**

14. In the summer of 2007, RPG and Davis entered into discussions with one of RPG's largest customers concerning the creation, distribution and placement of, what will be called here, a "Signature Collection" of cards. The proposed venture represented a significant investment of resources in Davis by RPG.

15. Davis was intimately involved in developing the strategy used to convince RPG's customer to commit to the Signature Collection project and, as such, was made privy to highly confidential and proprietary information. Among other things, Davis came to RPG's corporate headquarters in Chicago in order to jointly present the proposal to the customer. The result was an agreement between RPG, RPG's customer and Davis concerning the development, promotion and sale of the Signature Collection, the terms of which were highly confidential.

16. In addition to highly confidential and proprietary information concerning the Signature Collection and RPG's relationship with its major customer, Davis at her request was also given access to highly confidential information concerning RPG's overall corporate efforts and results, including market research, strategies, sales goals, market studies and pricing analysis.

17. RPG continued to devote time and resources to the Signature Collection product line throughout the remainder of 2007, with a product launch in hundreds of locations established for March 2008, and nationally thereafter.

18. The Signature Collection was projected to materially increase revenue for both RPG and Davis.

19. In November of 2007, Davis completed the final artwork on the initial placement of cards for the Signature Collection, and submitted her designs to RPG. RPG is already in the midst of production, and is on the verge of distribution.

20. In connection with the Signature Collection project, Davis knew and understood, when RPG committed to doing that project with its customer, that, in accordance with RPG's standard business model and past practices, she would be responsible for refreshing and updating the Collection by providing at least three (3) new designs to RPG on a quarterly basis.

21. The Signature Collection was a joint venture between RPG and Davis, and was specifically and jointly promoted as such to one of RPG's largest and most significant customers. In order to fulfill the commitment it made to that customer, RPG cannot proceed with Signature Collection without the involvement and participation of Davis. In this regard, the interests of RPG and Davis with respect to the Signature Collection are inseparable.

**The Agreements**

22. The relationship between the parties began on or about November 30, 1990, when Davis entered into a license agreement with RPG ("the License Agreement"). Pursuant to the License Agreement, Davis agreed, for an initial period of five years, to provide designs, drawings and artwork for greeting cards to be manufactured and sold by RPG.

23. The License Agreement was renewed by the parties on multiple occasions. Specifically, the License Agreement was renewed on or about October 17, 1995, December 1, 2000, and March 22, 2006. The March 22, 2006 renewal was retroactive to January 1, 2006.

24. Under the October 17, 1995 renewal, the License Agreement became exclusive. RPG, thereafter, was to be the primary greeting card publisher, and Davis was to continue to "avoid working with" any company that competed directly with RPG.

25. Davis understood at all times relevant hereto that RPG would *never* agree to continue developing and promoting Davis cards generally, let alone Davis as the central RPG artist with the Signature Collection, if RPG thought for a moment that any of those efforts or any information related thereto would be delivered wholesale to a major RPG competitor.

26. Moreover, RPG takes all steps reasonably necessary to protect its confidential and proprietary and trade secret information from being disclosed.

27. Pursuant to the March 22, 2006 renewal (which was authored by Davis), Davis requested, and RPG agreed to a fundamental change in the parties' historical relationship. From that point on, Davis ceased to be merely an independent artist licensing her designs to RPG, and became an important business partner with RPG, intimately aware of and involved in the promotion and development of strategic planning of both products associated with Davis and matters concerning the company as a whole.

28. Pursuant to the March 22, 2006 renewal, Davis also agreed to hire a "senior manager" who would "work on a regular basis with [the] RPG staff and design team… to serve as a catalyst for new design growth and also help ensure our shared goals are reached with regards to marketing and product development."

29. Pursuant to the March 22, 2006 renewal, Davis was also given the right to be actively involved in "Key Account Relationships," including "the design, development and presentation of new products and introductions to all key accounts for RPG." This included "vendor briefings, meetings, trade shows and exhibitions."

30. Davis took advantage of the "Key Account Relationships" provision of the March 22, 2006 renewal by, among other things, becoming directly involved in negotiations with the initial Signature Collection customer, and participating in the other aspects of the planned national roll out. Because of the roles she played, Davis was also made privy to confidential information and trade secrets of RPG concerning the entire company's plans and strategies and operations. Davis unquestionably understood that such information was not to be disclosed to RPG competitors.

31. Davis, at all times and instances relevant hereto, was treated by RPG as a business and joint venture partner, with the interests of each party closely intertwined.

32. Davis, at all times relevant hereto, was also under contract with RPG pursuant to an exclusive license agreement. In those capacities, Davis, at least quarterly, personally visited RPG's corporate headquarters in Chicago.

33. By virtue of her actions and licensing agreements and possession of highly confidential and trade secret information of RPG, Davis owed RPG a duty of loyalty.

**The Promise and the Attempted Termination**

34. Under the March 22, 2006 renewal, Davis retained a very limited right to terminate the License Agreement: upon only the first and second anniversary dates of the renewal ( *i.e.*, January 1, 2007 and January 1, 2008).

35. In November 2007, as the Signature Collection project was being implemented, RPG and Davis began to discuss their continuing relationship knowing that the second anniversary date under the contract was approaching.

36. Davis understood that RPG would not commit to the Signature Collection, and incur all of the resultant commitments and risks associated with the Signature Collection, unless and until it was certain that Davis would not be exercising her upcoming option to terminate.

37. In this context, Davis spoke with the member of RPG's Board of Directors most responsible for her relationship with RPG, both current and historical, concerning whether she intended to terminate on the second anniversary date.

38. During that conversation, Davis, in *exactly* the same manner in which, over the course of seventeen years she had communicated her decisions, stated that it was her intent to remain with RPG.

39. Based on that conversation, as well as the uninterrupted seventeen-year business relationship and Davis' active involvement in the development and rolling out of the Signature Collection, RPG believed that Davis would not be exercising the termination option on the second anniversary date. RPG believes further that Davis understood this and, additionally, that Davis understood that RPG was continuing to invest substantial resources and goodwill into the launch of the Signature Collection project in reliance on its belief that Davis would not exercise her termination option on the second anniversary date.

40. Davis' stated intention was critical to RPG, as it signaled the continuation of the parties' seventeen-year relationship.

41. In reliance on that stated intention, and on Davis' substantial and continued involvement in the Signature Collection project, RPG took and continued taking a number of significant actions. Among other things, RPG abandoned any "backup" or contingency plans in anticipation of a potential January 1, 2008 termination. Timely replacing the committed shelf space, not to mention Davis' products generally, would have required an immediate and

substantial investment in other artists and their work. Believing that Davis intended to continue licensing her work to RPG, RPG ceased and/or did not begin work on those efforts. This was significant as, in one customer alone, Davis was to represent a significant amount of RPG's total shelf space; space that would otherwise need to be filled by other artists.

42. Equally significant, RPG continued to move forward with the Signature Collection project. As noted, RPG had also committed to a major corporate customer that it would roll out this project of great significance in early 2008, and shortly thereafter nationally with all of its customers.

43. Nevertheless, by letter dated December 28, 2007 --not the established termination date of January 1, 2008-- and in direct contravention of her stated intention, Davis purported to terminate her relationship with RPG.

44. In her supposed termination letter, Davis stated that she had "decided to pursue a *different path* in the future with another company," and that she had already "agreed to economic terms" that "meet my personal financial goals." (Emphasis supplied.)

45. The other "company" was not identified in the letter; however, Davis subsequently disclosed that the company with which she supposedly intends to pursue a "different path" is American Greetings, RPG's competitor and one of the industry giants.

46. More troubling, RPG has learned also that the "path" Davis will be pursuing is not "different." To the contrary, Davis intends to pursue the exact same "path" paved by RPG. Davis has just now advised RPG that American Greetings "is making a significant commitment to launch and market" the *Signature Collection* "in a meaningful way." Upon information and belief, those plans include, incredibly, marketing the Signature Collection concept to the same

customer with whom Davis and RPG jointly negotiated the RPG Signature Collection agreement.

47. Unquestionably, Davis was negotiating her Signature Collection "launch" with American Greetings at the very same time that she was developing and preparing to roll out with RPG the Signature Collection project.

48. Davis was also negotiating and pursuing a Signature Collection "launch" with American Greetings at the same time that she was bound by an exclusive licensing contract with RPG.

49. In her dealings with American Greetings, it is inevitable or it will soon be inevitable that Davis has disclosed or will disclose RPG's confidential information and trade secrets. Under no circumstances is American Greetings --or any other competitor--allowed to know, among other things: the fact that RPG has entered into the Signature Collection arrangement with its customer; the terms of RPG's arrangement with its customer, including marketing and pricing and projections and strategic emphasis; and the timing and manner and extent of the rollout of the project, both with the customer at issue now and nationally. It is equally certain that Davis may not disclose to an RPG competitor any of the other highly confidential financial information about RPG generally to which Davis requested, and was given, access.

50. RPG is now in the position of having to fulfill a major corporate commitment to one of its largest customers at a moment when Davis is preparing to "launch" at least the same card collection with one of RPG's prime competitors and, most likely, to do so at least in part with the same customer that agreed, with RPG, to commit to the Signature Collection, and in large measure, should she "succeed" in that "competition" it would be because of RPG's efforts.

51. For Davis to launch the Signature Collection with American Greetings generally, let alone with the customer that RPG reached agreement with, she will have to disclose to American Greetings RPG's confidential and proprietary plans and arrangements. Once disclosed, American Greetings will be able to use that trade secret information to improperly compete with and cause further irreparable harm to RPG.

52. If the Signature Collection is "launched" by American Greetings and not by RPG, RPG will suffer a substantial loss of goodwill and will be improperly and unfairly forced to compete with an entity, American Greetings, which will be in possession of RPG's highly confidential trade secret information. Under no circumstances should an exclusive licensor and co-venture partner such as Davis be permitted to deliver wholesale to an RPG competitor such information.

## COUNT I
## (Breach of Contract)

53. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 52 above, as if set forth fully herein.

54. Davis was party to a written contract with RPG.

55. For the reasons detailed herein, Davis breached her contractual obligations to RPG.

56. Further, the License Agreement to which Davis was a party contained the implied covenants of good faith and fair dealing.

57. Davis breached the covenants of good faith and fair dealing by taking the actions described herein.

58. RPG has suffered damages as result of Davis' breach of contract in an amount to be proved at trial.

**COUNT II**
**(Intentional and/or Negligent Misrepresentation)**

59. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 58 above, as if set forth fully herein.

60. Davis represented to RPG in early December 2007 that she intended to remain under contract with RPG.

61. Davis' representation was knowingly false and/or reckless and/or negligent and Davis knew, or should have so known.

62. The misrepresentation was material and was made in the hope that RPG would continue its investment in Davis' artwork and designs, particularly in the Signature Collection on which RPG was actively moving forward.

63. RPG did in fact reasonably rely on the misrepresentation.

64. By virtue of the foregoing, RPG has been damaged.

65. Consequently, RPG is entitled to damages in an amount to be determined by the Court, together with interest, costs and attorneys' fees to the extent permitted by law.

**COUNT III**
**(Breach of Fiduciary Duty)**

66. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 65 above, as if set forth fully herein.

67. Davis owed and continues to owe RPG fiduciary duties by virtue of her status as an exclusive licensor, by virtue of her status as a business partner and joint venture partner of RPG, by virtue of the highly confidential information she possesses, and by virtue of the trust and confidence that RPG reposed in her.

68. Those fiduciary duties include an obligation not to reveal or disclose to a third party RPG's confidential information or trade secrets.

69. Davis breached her fiduciary duties by using and disclosing RPG's confidential information and trade secrets.

70. Davis' fiduciary duties also include a duty of loyalty to RPG.

71. Davis further breached her fiduciary duties by taking the actions described herein.

72. RPG has been damaged by Davis' breach of her fiduciary duties and duty of loyalty in an amount to be proved at trial.

**COUNT IV**
**(Promissory Estoppel)**

73. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 72 above.

74. Davis made unambiguous promises (1) that she intended to remain under contract with RPG and (2) that she would provide and deliver designs and artwork for the Signature Collection.

75. RPG relied on Davis' promises.

76. RPG's reliance was expected and foreseeable from Davis' perspective.

77. RPG's reliance on Davis' promises was detrimental.

78. RPG is entitled to recover damages for the profits it would have made had Davis kept her promises.

**COUNT V**
**(Violation of Illinois Trade Secrets Act)**

79. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 78 above.

80. RPG reposed its trust and confidence in Davis by disclosing to her, and allowing her access to, RPG's confidential information, including but not limited to business plans, market research, market studies, pricing plans, personnel strategies and consumer strategies.

81. The information described above constitutes trade secrets entitled to protection under the Illinois Trade Secrets Act, 765 ILCS 1065/1, et seq.

82. This information provides actual and/or potential economic value to RPG.

83. This information was kept secret by RPG and was not generally known or available to other persons.

84. This information was subject to reasonable security measures to maintain secrecy or confidentiality.

85. Davis threatens to and/or actually has misappropriated RPG's trade secrets and has used and/or is planning to use them by taking and converting said information to American Greetings for the purpose of soliciting and/or entering into a new licensor/licensee relationship with American Greetings and/or entering into agreements, either alone or in conjunction with American Greetings, with RPG's customers.

86. As a direct and proximate result of Davis' wrongful conduct, RPG has suffered and will continue to suffer damages in an amount to be determined by the Court.

87. Consequently, RPG is entitled to damages in an amount to be determined by the Court, together with interest, costs and attorneys' fees to the extent permitted by law.

## COUNT VI
## (Preliminary and Permanent Injunctive Relief)

88. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 87 above, as if set forth fully herein.

89. RPG is likely to succeed on the merits of its claims against Davis.

90. RPG will be irreparably harmed without the issuance of an injunction due to the actions of Davis described herein.

91. RPG has no adequate remedy at law for the loss or threatened loss of highly valuable confidential information and trade secrets; thus, injunctive relief is appropriate.

92. The balance of harms tips in favor of issuing an injunction for RPG's benefit.

93. RPG is entitled to injunctive relief.

94. As a result of the acts described herein, RPG is entitled to recover its expenses of litigation, including reasonable attorneys' fees.

## REQUESTS FOR RELIEF

WHEREFORE, RPG respectfully requests that this Court:

1. Enter a temporary restraining order, followed by a preliminary and then a permanent injunction, immediately restraining and enjoining Davis, whether directly or indirectly, alone or in concert with other persons or corporate entities until further Order of this Court, from using, disclosing, or transmitting to any individual or entity, for any purpose, the following trade secrets and proprietary information of RPG (collectively, the "Confidential Information"): (a) information constituting or concerning RPG's agreements, arrangements, efforts, plans, strategies, negotiations, discussions and/or communications regarding the Signature Collection; (b) information constituting or concerning RPG's corporate operations and strategic planning, including personnel strategies, customer strategies, consumer strategies and competitive strategies; and (c) information constituting or concerning RPG's market surveys, market analysis, pricing, product development, marketing initiatives, sales techniques, customer relationships, or any other proprietary information conveyed to Davis by RPG.

2. Enter a temporary restraining order, followed by a preliminary and then a permanent injunction, immediately restraining and enjoining Davis, whether directly or indirectly, alone or in concert with other persons or corporate entities until further Order of this Court, from offering, marketing, selling, licensing, transferring or otherwise bestowing any economic or financial interest in the Signature Collection to anyone, including but not limited to American Greetings, except with the prior express written permission and consent of RPG.

3. Enter a temporary restraining order, followed by a preliminary and then a permanent injunction, immediately restraining and enjoining Davis, whether directly or indirectly, alone or in concert with other persons or corporate entities until further Order of this Court, from interfering with or disrupting RPG's production, distribution, introduction and/or presentation of the Signature Collection for retail sale.

4. Enter an order directing and compelling Davis to complete her obligations, responsibilities and commitments to RPG as regards the Signature Collection, by providing to RPG at its corporate headquarters, every three months for a period of one (1) year, at least three (3) new card designs to refresh the Signature Collection.

5. Enter judgment on all counts in favor of RPG and against Davis, and order Davis to pay damages to RPG, and all costs, interest and attorneys' fees; and

6. Grant RPG such other and further relief as the Court deems just and equitable.

Dated: January 10, 2008

Respectfully submitted,

RECYCLED PAPER GREETINGS, INC.

By: /s/ Joel W. Rice
One of the Attorneys for Plaintiff

Craig R. Annunziata
Illinois Bar No. 6209487
Joel W. Rice
Illinois Bar No. 6186471
FISHER & PHILLIPS, LLP
140 South Dearborn Street
Suite 1000
Chicago, IL 60603
(312) 346-8061

Steven Manchel
MANCHEL & BRENNAN, P.C.
199 Wells Avenue, Suite 301
Newton, MA 02459
(617) 796-8920

**VERIFICATION**

I, Jude Rake, declare as follows:

1. I am the Chief Executive Officer of Recycled Paper Greetings, Inc.

2. I have personal knowledge of the facts concerning Recycled Paper Greetings, Inc. and its activities that are set forth in the Statement of Facts in the foregoing Verified Complaint, and I affirm their truth.

3. I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 10th day of January, 2008.

Jude Rake
Chief Executive Officer
Recycled Paper Greetings, Inc.

**CERTIFICATE OF SERVICE**

The undersigned attorney of FISHER & PHILLIPS LLP, certifies as follows:

That on January 11, 2008, **VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF AND JURY DEMAND** will be served upon:

Kathy Davis
1045 Limekiln Pike
Ambler, Pennsylvania 19002

Kathy Davis
Kathy Davis Studios
1126 Horsham Road, Suite B-1
Amber, Pennsylvania 19002

via hand delivery by process server.

/s/ Joel W. Rice