IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RECYCLED PAPER GREETINGS, INC., an Illinois Corporation, ) ) ) | |
| Plaintiff, ) | Case No. 08 C 236 |
| ) | |
| v. ) | Judge Elaine E. Bucklo |
| ) | |
| KATHY DAVIS, ) | Magistrate Judge Morton Denlow |
| ) | |
| Defendant. ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

The plaintiff, Recycled Paper Greetings, Inc. ("RPG"), seeks a preliminary injunction barring the defendant, Kathy Davis ("Davis"), from using or disclosing to any third party, including but not limited to one of RPG's prime competitors, American Greetings Corporation ("American Greetings"), the confidential, proprietary and trade secret information that she obtained from RPG, and from delivering wholesale to American Greetings the business arrangement RPG just entered into with one of its largest customers. As demonstrated below, RPG meets the standards for the entry of a preliminary injunction.

### FACTUAL BACKGROUND

A statement of the facts is contained in the Verified Complaint. Rather than repeating those facts, RPG incorporates them into this Memorandum.

### ARGUMENT

In order to obtain an injunction, the moving party must show that: (1) it is likely to succeed on the merits of its claims; (2) it has no adequate remedy at law; and (3) it faces a threat of irreparable harm absent an injunction. Foodcomm Int'l v. Barry, 328 F.3d 300, 303 (7th Cir.

1

Chicago 89244.1

2003). Once the moving party establishes these requirements, the Court then evaluates the balance of harms: if the harm the plaintiff will suffer absent an injunction outweighs any harm to the defendant if the injunction issues, the Court must issue the injunction. Storck v. Farley Candy Co., 14 F.3d 311, 314 (7th Cir. 1994). The Court must also consider the "public interest, meaning the consequences of granting or denying the injunction to non-parties." Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 11 (7th Cir. 1992).

## I.   RPG IS LIKELY TO SUCCEED ON THE MERITS.

RPG asserts the following substantive claims in its Verified Complaint: Breach of Contract (Count I); Intentional and/or Negligent Misrepresentation (Count II); Breach of Fiduciary Duty (Count III); Promissory Estoppel (Count IV); and violation of the Illinois Trade Secrets Act (Count V). RPG is likely to succeed on each of these claims.

### A.   Davis Misappropriated RPG's Trade Secrets.

To be entitled to relief under the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 et seq., a plaintiff "must prove two elements: 1) the existence of a 'trade secret'; and 2) 'misappropriation' of that trade secret." RKI, Inc. v. Grimes, 177 F. Supp. 2d 859, 873 (N.D. Ill. 2001). The Act states specifically that "[a]ctual or threatened misappropriation may be enjoined." 765 ILCS § 1065/3(a).

#### 1.   The existence of RPG's agreement with its customer, as well as its business, marketing and strategic plans, are trade secrets.

Illinois courts look to the following factors for guidance in determining what constitutes a trade secret, although no particular factors or combination of factors is required:

> (1) the extent to which the information is known outside of the plaintiff's business; (2) the extent to which the information is known by employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff's business and to its competitors; (5) the amount of time, effort and money expended by the plaintiff in

2

developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Learning Curve Toys, Inc. v. PlayWood Toys, Inc., 342 F.3d 714, 721 (7th Cir. 2003) (citing Rest. of Torts, §757).

The highly confidential information at issue here unquestionably constitutes trade secrets. In the Summer of 2007, Davis -- who had a 17-year business relationship with RPG -- upon her request joined in RPG's discussions with one of its largest customers concerning the creation, distribution and placement of a "Signature Collection." As such, Davis was intimately involved in developing the concept and marketing strategy used by RPG. Davis even came to RPG's corporate headquarters in Chicago to present the proposal jointly to the customer. In the course of developing this unique venture with RPG and its customer, Davis was also given access to highly confidential information concerning RPG's overall market research, strategies, personnel, sales goals, market studies, results, forecasts and pricing analyses. Ultimately, RPG's customer agreed to roll the Signature Collection project out first into hundreds of stores, and then nationally.

Maintaining the confidentiality of the terms of that project -- including the existence of the customer commitment and the roll out plans -- is critical to RPG's success and competitive edge in the marketplace. For just such reasons, courts in Illinois have not hesitated to find the existence of trade secrets in similar circumstances. See Brostron v. Warmann, 190 Ill. App. 3d 87, 546 N.E.2d 3, 5 (3d Dist. 1989) (gross profits); PepsiCo, Inc. v. Redmond, 54 F.3d 1262, 1270 (7th Cir. 1995) (strategic goals); Roton Barrier, Inc. v. Stanley Works, 79 F.3d 1112, 1118 (7th Cir. 1996) (corporate financial data and gross profits). See also Mangren Research & Dev. Corp. v. National Chem. Co., 1995 WL 33102, at *3 (N.D. Ill. Jan. 26, 1995) ("customer information and cost and pricing information were trade secrets"), aff'd, 87 F.3d 937 (7th Cir.

3

1996); M&J Partners Restaurant Ltd. v. Zadikoff, 10 F. Supp. 2d 922, 933 (N.D. Ill. 1998) (allegation that defendant misappropriated "information regarding suppliers, sales, employee history, gross profits, revenues, expenses, financing agreements, investor lists, marketing plans, and special customer relationships" stated claim under ITSA).

RPG is thus likely to succeed on the merits of its claim that the information which Davis misappropriated constitutes a trade secret within the meaning of the ITSA.

### 2. Davis misappropriated RPG's trade secrets.

RPG also will succeed on its claim that Davis misappropriated those trade secrets. Davis already has disclosed or intends to disclose RPG's trade secrets to American Greetings, or she inevitably will do so.

*(a)    Davis has disclosed or intends to disclose RPG's trade secrets.*

Among other types of misappropriation, the ITSA prohibits:

> (2) disclosure or use of a trade secret of a person without express or implied consent by another person who ... (B) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was ... (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use[.]

765 ILCS § 1065/2(b).

It is beyond dispute that RPG did not give Davis its consent, express or implied, to disclose its trade secrets to American Greetings (or anyone else). RPG could not have given such consent (and Davis knew it never would) because it had no idea that Davis was shopping the Signature Collection -- something that Davis assiduously hid from RPG.

It is equally certain that Davis knew she had acquired RPG's trade secret information "under circumstances giving rise to a duty to maintain its secrecy or limit its use." 765 ILCS § 1065/2(b)(2)(B)(II). Davis had been affiliated with RPG for 17 years. Davis insisted that she be given the contractual right to play a central and direct role in RPG customer projects. Davis, for

4

the first time, was given access to information about RPG's clients and business operations. Davis was keenly aware of RPG's place in the greeting card industry. Davis most assuredly knew or should have known that detailed information concerning RPG's venture with one of its most prominent customers, and regarding RPG's corporate-wide financial data and marketing strategies, should under no circumstances be given to any competitor of RPG, let alone to one of its biggest competitors.

Davis's actions and recent pronouncements make it extremely likely that she has, in fact, disclosed or intends to disclose RPG's trade secrets to American Greetings. Davis knew that RPG would not commit to the Signature Collection, and incur all of the resultant obligations and risks, unless and until it was certain that Davis would not be exercising her upcoming option to terminate her relationship with RPG. Davis understood also that RPG was investing substantial resources and goodwill into the launch of the Signature Collection project in reliance on its belief that she would not exercise her termination option. So, as she had done repeatedly in the past, Davis communicated her intention to stay with RPG.

Given the relevant timeframes, however, Davis was unquestionably pursuing the Signature Collection "launch" with American Greetings while she was partnering with RPG to roll out the Signature Collection project. Why did she string RPG along by announcing her intention to stay? Why did she continue to participate directly in the project with RPG? And why, when she finally gave her purported notice of termination, did she conspicuously fail to name her new "business partner" and falsely tell RPG that she was taking "a different path"? Simply put, Davis did all of this so that she could shop RPG's deal.

Illinois courts protect trade secrets in part to encourage "commercial morality" and business ethics. Brunswick Corp. v. Outboard Marine Corp., 79 Ill. 2d 475, 404 N.E.2d 205, 207

5

(1980). On these facts, RPG's likelihood of success on the merits is therefore extremely high. See Lucini Italia Co. v. Grappolini, 2003 WL 1989605, at *17 (N.D. Ill. Apr. 28, 2003) (consultant's misappropriation of plaintiff's trade secrets evidenced by fact that consultant was negotiating for his own arrangement with potential exclusive supplier to plaintiff while failing to disclose this fact to plaintiff and continuing to acquire plaintiff's trade secrets).

*(b)    Davis will inevitably disclose RPG's trade secrets.*

While RPG will prove that Davis in fact misappropriated its trade secrets, it need not do so to secure an injunction and prevail on the merits, because Davis inevitably will disclose RPG's trade secrets to American Greetings. In PepsiCo, Inc. v. Redmond, 54 F.3d 1262 (7th Cir. 1995), the Seventh Circuit adopted the "inevitable disclosure" doctrine, holding that "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." Id. at 1269. "The factors to determine whether disclosure of trade secrets is inevitable are: 1) the level of competition between the former employer and the new employer; 2) whether the employee's position with the new employer is comparable to the position he held with the former employer; and 3) the actions the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer." RKI, Inc. v. Grimes, 177 F. Supp. 2d 859, 876 (N.D. Ill. 2001) (citing PepsiCo v. Redmond, 1996 WL 3965, at *17-20 (N.D. Ill. 1996)). As to the third factor, the burden is on the *defendant*, not the plaintiff, to prove that the defendant will *not* use or disclose confidential information. Id.

The facts of the present case fit squarely within the inevitable disclosure doctrine. RPG and American Greetings are direct competitors, although American Greetings is significantly larger. Davis has now *admitted* to RPG that she intends not only to work with American

6

Greetings, but that American Greetings will take up the Signature Collection card project. Indeed, upon information and belief, Davis and American Greetings intend to market the Signature Collection *to the very same RPG customer with which Davis and RPG negotiated the Signature Collection deal.* RPG is not aware of any facts (and it is Davis's burden to show them, see Grimes, 177 F. Supp. 2d at 876) to suggest that satisfactory steps -- indeed any steps -- are being taken to ensure that Davis does not disclose RPG's confidential information. On the contrary, RPG anticipates that American Greetings already has acquired RPG's confidential information.

It will be impossible for Davis to continue a business relationship with American Greetings -- or another RPG competitor -- without disclosing the substantial amount of confidential, proprietary and trade secret information that she has acquired; especially if, as she has announced, she intends to play an identical role with American Greetings and plans further to continue shopping the Signature Collection concept. RPG is therefore entitled to an injunction. See RKI, 177 F. Supp. 2d at 875-76.

    **B.**    **Davis Breached Her Fiduciary Duty To RPG.**

In addition to proving that Davis violated the ITSA, RPG will show that Davis owed RPG a fiduciary duty, and that Davis breached that duty by disclosing RPG's confidential information to American Greetings.

        **1.**    **Davis and RPG were joint venturers with respect to the Signature Collection.**

A "joint venture" is defined simply as "an association of two or more persons to carry out a single enterprise for profit." Thompson v. Hiter, 356 Ill. App. 3d 574, 826 N.E.2d 503, 510 (1st Dist. 2005) (quoting In re Johnson, 552 N.E.2d 703, 707 (1989)). "A formal agreement is not essential to establish a joint venture." Id. (quoting Fitchie v. Yurko, 570 N.E.2d 892, 900

7

(1991)). Rather, "[t]he existence of a joint venture may be inferred from circumstances demonstrating that the parties in fact entered into a joint venture[.]" Id. The elements of a joint venture are:

> (1) a community of interest in the purpose of the joint association; (2) a right of each member to direct and govern the policy of conduct of the other members; (3) a right to joint control and management of the property used in the enterprise; and (4) a sharing in both profit and losses.

Id. The elements of a joint venture also have been formulated as

> (1) an express or implied agreement to carry on an enterprise, (2) a manifestation of intent by the parties to be associated as joint venturers, (3) a joint interest, as reflected in the contribution of property, finances, effort, skill or knowledge by each party to the joint venture, (4) a measure of proprietorship or joint control of the enterprise; and (5) a provision for the sharing of profits or losses.

Id. at 510 n.1.

While the relationship between Davis and RPG originated 17 years ago as that of licensor and licensee, that relationship unquestionably grew into a joint venture with respect to at least the Signature Collection. Davis's relationship with RPG clearly progressed, factually and contractually, from merely supplying artwork to actively working with RPG as a full business partner. In that capacity, Davis was intimately involved in developing the strategy used to convince RPG's customer to commit to the Signature Collection project and, as such, was made privy to highly confidential and proprietary information. As noted, Davis even came to RPG's corporate headquarters in Chicago in order to jointly present the proposal to the customer.

This fundamental change in the parties' relationship was memorialized in the March 22, 2006 renewal. From that point, Davis became an important business partner with RPG, intimately aware of and involved in the promotion and development of strategic planning of both products associated with Davis and matters concerning the company as a whole. In that contract, for example, Davis specifically negotiated for and obtained the right, for the first time, to be

8

directly involved in "Key Account Relationships," including "the design, development and presentation of new products and introductions to all key accounts for RPG," including participation in "vendor briefings, meetings, trade shows and exhibitions." Pursuant to the March 22, 2006 renewal, Davis also agreed to hire a "senior manager" who would "work on a regular basis with [the] RPG staff and design team [to] help ensure our shared goals are reached with regards to marketing and product development."

These are the classic hallmarks of a joint venture, and Davis and RPG unquestionably shared a community of interest in the Signature Collection. Indeed, Illinois courts have found joint ventures to exist on far less compelling facts. See Fitchie v. Yurko, 212 Ill. App. 3d 216, 570 N.E.2d 892, 900-01 (2d Dist. 1991).

### 2.   Davis and RPG were parties to a confidential relationship.

Even if Davis and RPG were not parties to a joint venture -- and they were -- they nevertheless entered into a confidential relationship giving rise to the same duties. Specifically, where one party discloses confidential information to another party for their mutual benefit or potential benefit, the party receiving the confidential information has a duty not to use or disclose it to his own advantage at the expense of the disclosing party. Jones v. Ulrich, 342 Ill. App. 16, 95 N.E.2d 113, 117 (3d Dist. 1950).

In Ulrich, the plaintiff entered into an agreement with the defendant whereby the defendant would manufacture and sell the plaintiff's invention and pay royalties. The defendant subsequently claimed the invention for his own and began making and selling it without paying royalties. The court held that, "[i]n such a case precedent establishes a confidential relationship irrespective of a contract between the parties not to disclose the subject matter of the disclosure.... Such an agreement in itself implies a confidential relationship because without

9

such confidence, such an agreement in practicality would be a nullity." Id. See also Crocan Corp. v. Sheller-Globe Corp., 385 F. Supp. 251, 253 (N.D. Ill. 1974) (supplier of materials for rubber tie-downs held liable to tie-down manufacturer for surreptitiously taking confidential information and using it to start its own tie-down manufacturing business); Smith v. Dravo Corp., 203 F.2d 369, 377-78 (7th Cir. 1953) (applying Pennsylvania law, held that district court should have enjoined defendant from making any use of confidential information he learned from plaintiff, where plaintiff sent defendant secret designs and business information for defendant's consideration in possible purchase of plaintiff's business, but defendant used that information to launch competing business); Burten v. Milton Bradley Co., 763 F.2d 461, 463 (1st Cir. 1985) ("Where the facts demonstrate that a disclosure was made in order to promote a specific relationship ... the parties will be bound to receive the information in confidence.... The formation of a confidential relationship imposes upon the disclosee the duty to maintain the information received in the utmost secrecy").

RPG disclosed highly confidential information to Davis, upon her request and in anticipation and furtherance of the joint efforts to develop and implement the Signature Collection project. This disclosure created a duty on Davis's part to refrain from doing precisely that which she has done -- disclose that confidential information to an RPG competitor and use it for her own benefit.

### 3. As a joint venturer and party to a confidential relationship, Davis owed RPG a fiduciary duty.

Parties to a joint venture owe each other a fiduciary duty that "imposes upon all the participants the obligation of loyalty to the joint concern and of the utmost good faith, fairness, and honesty in their dealings with each other with respect to matters pertaining to the enterprise."

10

Ditis v. Ahlvin Constr. Co., 408 Ill. 416, 97 N.E.2d 244, 250 (1951) (quoting 30 Am. Jur. 695, ¶ 34)). This fiduciary relationship "prohibits all forms of trickery, secret dealings and preference of self in matters relating to and connected with a ... joint venture." Bakalis v. Bressler, 1 Ill. 2d 72, 115 N.E.2d 323, 327 (1953). Joint venturers are required to make full disclosure to each other of all matters affecting the venture, Mobil Oil Corp. v. Hurwitz, 63 Ill. App. 3d 430, 380 N.E.2d 49, 52 (4th Dist. 1978), and they are prohibited from advancing their own interests at the expense of the joint venture's interest. Maercker Point Villas Condo. Ass'n v. Szymski, 275 Ill. App. 3d 481, 655 N.E.2d 1192, 1193-94 (2d Dist. 1995).[1]

  4.   **Davis breached her fiduciary duty.**

Davis's conduct clearly violated her fiduciary duty to RPG. Rather than acting with the utmost good faith and loyalty to RPG, as she was required to do, she took the Signature Collection deal -- the very heart of the joint venture -- and shopped it to one of RPG's prime competitors, all the while hiding her true intentions from RPG. Davis thereby advanced her own interests, not to mention those of American Greetings, at the expense of RPG. On these facts, RPG is not only likely but virtually certain to succeed on the merits.

  C.   **RPG Will Succeed On Its Remaining Claims.**

RPG is likely to succeed on its other claims as well. RPG will succeed on its breach of contract claim because Davis attempted to terminate her agreement with RPG in violation of the express termination provision, thereby unlawfully abandoning, among other things, the Signature Collection project, and because Davis has admitted working with American Greetings, a violation of her exclusive licensing arrangement.

---

[1] As discussed above, similar duties are created by the existence of a confidential relationship such as existed between Davis and RPG. See Ulrich, 95 N.E.2d at 117; Crocan Corp., 385 F. Supp. at 253; Dravo Corp., 203 F.2d at 377-78.

11

RPG also satisfies all the elements of a claim for intentional or negligent misrepresentation: "(1) [a] false statement of material fact; (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." Soules v. General Motors Corp., 79 Ill. 2d 282, 402 N.E.2d 599, 601 (1980).[2] RPG will show that Davis, at the time she assured RPG of their continuing relationship, was in fact shopping the Signature Collection to American Greetings. Alternatively, in the unlikely event that Davis's misrepresentations were not "intentional," she had a duty as a fiduciary of RPG to fully disclose to RPG the facts and circumstances of her discussions with American Greetings -- something she completely failed to do.

Finally, RPG will succeed on its claim of promissory estoppel, the elements of which are "(1) a promise unambiguous in terms, (2) with reliance thereon by the promisee, (3) with such reliance being expected and foreseeable by the promisor, and (4) with the promisee in fact relying on the promise to his injury." Vajda v. Arthur Andersen & Co., 253 Ill. App. 3d 345, 624 N.E.2d 1343, 1350 (1st Dist. 1993). Here, RPG has alleged and will prove that Davis represented, at a critical moment in the Signature Collection project process, that she would remain with RPG. As a result, and Davis knew that this would be the result, RPG continued investing substantial resources and corporate goodwill into the Signature Collection project.

---

[2] The elements of a claim for negligent misrepresentation are similar, except that the misrepresentation is made carelessly or negligently, and the defendant must have a duty to communicate accurate information. Roe v. Jewish Children's Bureau of Chicago, 339 Ill. App. 119, 790 N.E.2d 882, 893 (1st Dist. 2003).

12

Chicago 89244.1

## II. RPG HAS NO ADEQUATE REMEDY AT LAW AND WILL SUFFER IRREPARABLE HARM IF THE INJUNCTION IS NOT GRANTED.

Where, as here, there has been an unauthorized or threatened disclosure of trade secrets, the harm suffered by the holder of the trade secrets is considered irreparable as a matter of law. As this Court has observed:

> The disclosure of even a single trade secret is sufficient to cause irreparable harm.... Consequently, the court concludes that where trade secrets and confidential information are at issue, as they are here, irreparable harm flows necessarily from the actual or threatened loss of the important protectible business interests at stake. Therefore, a preliminary injunction is the only remedy adequate to curtail the irreparable harm that would otherwise inevitably follow.

PepsiCo v. Redmond, 1996 WL 3965, at *30 (N.D. Ill. Jan. 2, 1996) (citations omitted). See also Computer Assocs. Int'l v. Quest Software, Inc., 333 F. Supp. 2d 688, 700 (N.D. Ill. 2004). Here, Davis has disclosed or inevitably will disclose not only RPG's trade secrets concerning the Signature Collection, but also trade secrets pertaining to RPG's general business, operations and strategy. This alone is sufficient to establish irreparable harm.

Additionally, RPG's reputation and goodwill with its major customer will be substantially diminished if Davis is permitted to steal away the Signature Collection and give it to American Greetings. RPG invested significant resources to promote the Signature Collection concept to its customer, and ultimately achieved the customer's buy-in and commitment nationwide to that concept. If RPG is now unable to deliver the Signature Collection to the customer -- as will be the case if Davis is allowed to get away with her wrongful conduct -- RPG's credibility and reliability will, to a significant extent, be tarnished. The damages for this loss of reputation cannot be quantified. Indeed, this Court has held that, "'it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage

13

to reputation and loss of goodwill....' Thus, these type of injuries are presumed irreparable." SMC Corp. v. Lockjaw, LLC, 481 F. Supp. 2d 918, 927-28 (N.D. Ill. 2007) (quotations omitted).

Moreover, if Davis is allowed to proceed with her wrongful conduct and reap benefits from it, other artists -- whose original designs are the lifeblood of RPG -- may believe they can do likewise. The harm that RPG would suffer from such copycat behavior would be immeasurable. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Patinkin, 1991 WL 83163, at *6 (N.D. Ill. May 9, 1991) (leaving plaintiff vulnerable to same conduct by other employees and resultant potential harm would be "enormous").

Only an injunction will adequately protect RPG from the immediate and irreparable harm it will suffer if Davis is not stopped, and only a preliminary injunction can preserve the *status quo* until the Court can fully address the merits of RPG's claims.

### III. THE BALANCE OF EQUITIES FAVORS RPG.

The requested relief protects RPG's interests in maintaining the confidentiality of trade secrets, in preserving its customer relationships and in enforcing its agreements, all while imposing minimal restrictions on Davis.

As discussed above, the consequences to RPG if this Court does not grant an injunction are tremendous. The burden that will be imposed on Davis if an injunction enters is, by contrast, minimal. RPG simply asks this Court to enjoin Davis from using or disclosing its confidential, proprietary and trade secret information, and from delivering the Signature Collection to any competitor of RPG. These requests do nothing more than: (1) prevent Davis from engaging in illegal behavior; and (2) preserve the *status quo*. None of Davis's legitimate interests are burdened by these requests.

Chicago 89244.1

Moreover, the proposed injunction does not interfere with the public interest. On the contrary, "vital public interests" are served by orders that protect "fair competition, business innovation and economic efficiency" by prohibiting the disclosure of trade secrets. PepsiCo, 1996 WL 3965, at *32. Additionally, "the public interest is served by enforcing valid contracts." SMC Corp., 481 F. Supp. 2d at 927-28. The public interest factor, therefore, weighs in favor of granting the injunction.

## CONCLUSION

For the foregoing reasons, RPG respectfully requests that the Court enter a preliminary injunction in the form of the proposed Order submitted herewith.

Dated: January 11, 2008

Respectfully submitted,

RECYCLED PAPER GREETINGS, INC.

By: _____
One of the Attorneys for Plaintiff

Craig R. Annunziata
Illinois Bar No. 6209487
Joel W. Rice
Illinois Bar No. 6186471
FISHER & PHILLIPS, LLP
140 South Dearborn Street
Suite 1000
Chicago, IL 60603
(312) 346-8061

Steven Manchel
MANCHEL & BRENNAN, P.C.
199 Wells Avenue, Suite 301
Newton, MA 02459
(617) 796-8920

## CERTIFICATE OF SERVICE

The undersigned attorney of FISHER & PHILLIPS LLP, certifies as follows:

That on January 11, 2008, **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR PRELIMINARY INJUNCTION** was served via regular U.S. Mail, and hand delivery via process server will be attempted upon:

    Kathy Davis
    1045 Limekiln Pike
    Ambler, Pennsylvania 19002

    Kathy Davis
    Kathy Davis Studios
    1126 Horsham Road, Suite B-1
    Ambler, Pennsylvania 19002

_____

Chicago 89244.1