**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RECYCLED PAPER GREETINGS, INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08 C 236 |
| | ) | |
| **KATHY DAVIS,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

On January 10, 2008, plaintiff Recycled Paper Greetings, Inc. ("RPG") filed a Verified Complaint for Injunctive and Other Relief against defendant Kathy Davis ("Davis"). The six-count complaint alleges claims for: (1) breach of contract; (2) intentional and/or negligent misrepresentation; (3) breach of fiduciary duty; (4) promissory estoppel; (5) violation of the Illinois Trade Secrets Act ("ITSA"), 765 Ill. Comp. Stat. 1065/1 *et seq.*; and (6) preliminary and permanent injunctive relief. Pursuant to Fed. R. Civ. P. 65, RPG moved for an order entering a preliminary injunction: (1) precluding Davis from using, disclosing, or transmitting its trade secret and proprietary information; (2) precluding Davis from offering, marketing, selling, licensing, transferring, or otherwise bestowing any economic or financial interest in the Signature Collection to anyone without RPG's express written consent; (3) precluding Davis from interfering with or disrupting RPG's production, distribution, introduction, and/or

presentation of the Signature Collection for retail sale; and (4) compelling Davis to complete her obligations, responsibilities, and commitments to RPG regarding the Signature Collection by providing to RPG every three months for a one-year period at least three new greeting card designs to refresh the Signature Collection.[1]  RPG also seeks a temporary restraining order.  For the following reasons, RPG's motion for temporary restraining order is denied, and RPG's motion for a preliminary injunction is entered and continued pending the completion of expedited discovery.

I.

The facts set forth below are taken from plaintiff's verified complaint, Davis' declaration opposing the motion for preliminary injunction and documents attached thereto, and the supporting

---

[1]Subsequently, RPG submitted a proposed order: (1) precluding Davis from delivering for commercial sale to American Greetings or any other entity "the collection of 60 Kathy Davis greeting cards[;]" (2) permitting Davis to market her greeting card designs only in the same manner in which she had until December 28, 2007, and specifically precluding her from using the names "Scatter Joy," "Signature Collection," "Showcase" or any combination thereof to be displayed in any store in which RPG sells greeting cards in any manner in which they are not now displayed; (3) precluding Davis from disclosing to any third party, and requiring her to return to RPG, any of its confidential information including but not limited to information concerning the Signature Collection project such as (a) the amount of shelf space, (b) the number of card designs, (c) the actual designs chosen, (d) the mix of those designs, (e) the in-store displays, (f) the location of the Signature Collection in stores, and (g) marketing strategy, sales goals, and pricing information; and (4) precluding Davis from disclosing to any third party, and requiring her to return to RPG, any other confidential information including but not limited to information about its corporate operations.

declarations submitted by RPG and documents attached thereto.

RPG has been in the business of selling greeting cards since 1971. Davis is an artist who designs and creates greeting cards. She is the Chief Executive Officer ("CEO") of Kathy Davis Designs, Inc. ("KDI"). RPG and Davis entered into a license agreement dated November 20, 1990, pursuant to which Davis agreed, for an initial period of five years from the date of the signed agreement,[2] to provide designs, drawings, and artwork for greeting cards to be sold and manufactured by RPG. The parties subsequently renewed the license agreement on October 17, 1995, December 1, 2000, and March 22, 2006.[3]

The March 2006 renewal was retroactive to January 1, 2006. Pursuant to the March 2006 renewal, KDS could terminate the license agreement as of January 1, 2008. The March 2006 renewal is silent, however, as to how to terminate the agreement. The March 2006 renewal also contains terms that (1) provide for the creation of a permanent branded collection of Davis' cards to be maintained by RPG for the duration of the parties' license agreement, and (2) allow KDS to participate in the design, development, and presentation of new products and introductions to RPG's key accounts.

---

[2]Davis signed and dated the agreement November 30, 1990.

[3]The October 1995 and December 2000 letters refer to RPG and KDD as the parties; the March 2006 letter refers to RPG and Kathy Davis Studios ("KDS") as the parties.

In the summer of 2007, RPG and Davis engaged in discussions with one of RPG's largest customers (the "Customer") regarding a "Signature Collection" of greeting cards. RPG alleges that, in the course of developing the strategy to convince the Customer to commit to the Signature Collection, Davis was made privy to highly confidential and proprietary information pertaining to the Signature Collection and RPG's relationship with the Customer. RPG further alleges that, pursuant to Davis' request, she was given access to highly confidential information regarding RPG's overall corporate efforts and results, including market research, strategies, sales goals, market studies, and pricing analysis. Davis states that KDI did not receive, and was not privy to, proprietary or confidential RPG information in connection with marketing to the Customer.

RPG alleges that it devoted time and resources to the Signature Collection for the remainder of 2007. RPG further alleges that Davis completed the final artwork for the initial greeting cards comprising the Signature Collection in November 2007. A test product launch in 300 of the Customer's locations is scheduled for March 2008. RPG contends that the Signature Collection was a joint venture between it and Davis, and that RPG cannot proceed with the Signature Collection without Davis' involvement and participation.

Jude Rake ("Rake"), CEO of RPG, attests that when the efforts

4

surrounding the Signature Collection were in their earliest stages and throughout the following months when the project was ongoing, RPG knew that Davis had the right to terminate her written contract on January 1, 2008. Rake further attests that, given RPG's plans "to roll out a very high profile change in marketing strategy with one of its most important customers, it was critical for RPG to be certain that Davis was not going to terminate the contract." Beginning in November 2007, the parties discussed their business relationship. The parties dispute the nature and the substance of these conversations.

Davis attests that, on November 8, 2007, KDI and RPG met in Chicago to address KDI's concerns in light of the approaching January 1, 2008 termination date. Rake attests that he met with Davis in Chicago in early November 2007, at which time he offered her the opportunity to terminate the contract in another year – at the end of 2008. Additionally, Michael Keiser ("Keiser"), a member of RPG's board of directors, attests that he spoke to Davis by telephone sometime in late November or early December 2007, at which time Davis told him her intention was to remain with RPG for at least another year. Davis attests that, as a result of the November 8 meeting, RPG prepared a proposed mutual agreement on or around November 30, 2007 "as a roadmap to attempt to preserve the parties' business relationship."

Davis attests that KDI responded to the November 30 proposal

on December 14, 2007.  The December 14 letter, on Centropy letterhead signed by Peter Walts ("Walts") as CEO, stated that further clarification of various issues was required before KDS could consider continuing the current agreement.  In particular, the December 14 letter asserted that KDS' "opportunity for potential revenue growth was greatly inhibited due to the fact that RPG did not introduce and build the dedicated Kathy Davis branded collection that was a negotiated condition of the current Agreeement[,]" and contended that as a result RPG had breached its obligation under the parties' contract.  The December 14 letter also stated that, "[a]s Kathy alluded to . . . KDS has been approached by potential partners to market the KDS greeting card and licensed product categories in the future, and we are actively considering these options."  Finally, the December 14 letter stated, "We know that your team is aware the KDS termination option in the Agreement expires on December 31, 2007, so please address the above issues in detail, and respond in writing on or before Thursday, December 20, 2007."

RPG replied to KDS' inquiries with a document dated December 27, 2007.  With regard to the March 2008 Signature Collection test, the December 27 reply stated that RPG "[r]ecently" got permission from the Customer to support the Signature Collection with certain signage.  The December 27 reply also acknowledged that RPG had not been successful in delivering the Davis branded collection showcase

as quickly as it hoped, which "has been a partnering effort as demonstrated by [the parties'] joint effort to call and sell [the Customer] on the new showcase."  The December 27 reply further stated that RPG would accelerate the Davis branded collection initiative in 2008 after it has successfully proven itself in the test launch with the Customer.

Rake attests that the December 14 and 27 communications were not related to the immediate termination of the license agreement, but rather to reaching an agreement on certain terms so that Davis would remain with RPG for the additional year beyond the January 1, 2008 termination date.  Ultimately, in a letter to Rake dated December 28, 2007, Davis terminated the parties' relationship. Davis also sent a letter to "Jude, Mark, Mike, Phil, and Mary" dated January 4, 2008 "to follow up on [her] notice letter."

RPG contends that Davis and American Greetings, RPG's competitor, plan to market the Signature Collection to the Customer.  RPG also alleges that it is inevitable, or it soon will be inevitable, that in the course of Davis' dealings with American Greetings she has disclosed, or will disclose, RPG confidential and trade secret information.  Specifically, RPG asserts that neither American Greetings nor any competitor is allowed to know, among other things:  the fact that RPG has entered into the Signature Collection arrangement with the Customer; the terms of RPG's arrangement with the Customer, including marketing, pricing,

projections, and strategic emphasis; and the timing, manner, and extent of the rollout of the project, both with the Customer and nationally in the future.

## II.

A temporary restraining order or a preliminary injunction is an extraordinary and drastic remedy, which should not be granted unless the movant carries the burden of persuasion by a clear showing. *See Goodman v. Illinois Dept. of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005) (affirming denial of preliminary injunction).  In order to obtain either injunction, RPG must show: (1) it has a reasonable likelihood of success on the merits; (2) it has no adequate remedy at law;(3) it will suffer irreparable harm without injunctive relief, which outweighs the irreparable harm Davis will suffer with injunctive relief; and (4) the injunction will not harm the public interest. *See id.*; *Long v. Bd. of Educ., Dist. 128*, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001).

## III.

RPG bases its request for a temporary restraining order on two main arguments.  First, RPG asserts that Davis and RPG were parties to a joint venture, or alternatively to a confidential relationship, and accordingly Davis owed RPG a duty not to disclose information relating to the Signature Collection.  Second, RPG contends that, regardless of any duty Davis owed RPG because of the parties' relationship, the information relating to the Signature

8

Collection is protected from being disclosed as trade secret under the ITSA. Finally, RPG argues that it is also likely to succeed on its breach of contract, intentional and/or negligent misrepresentation, and promissory estoppel claims.

Based on the information presented to me, I am unable to find that RPG is likely to succeed on the merits of its claims. Because RPG has failed to satisfy the likelihood of success requirement for obtaining injunctive relief, I need not address the remaining requirements. My conclusions in denying the motion for temporary restraining order are based on declarations, which indicate disputes exist regarding what was said, when it was said, and the interpretation of certain contract terms. The resolution of questions regarding credibility as to these disputed issues is necessary to determine whether the entry of a preliminary injunction is warranted. At the hearing on the motion for temporary restraining order, the parties, through counsel, were told that I thought an evidentiary hearing might be necessary. Counsel indicated their clients would not be available during the time period when they wanted a resolution of the motion before me. It may be that further evidence, including testimony that would permit credibility findings that cannot be made on this record, will show that RPG has a sufficient likelihood of success such that the other requirements for a motion for preliminary injunction should be addressed. I only conclude that there is an insufficient

basis on the current record to justify a temporary restraining order.

First, RPG argues that Davis breached a fiduciary duty owed to RPG as a co-joint venturer with respect to the Signature Collection.  "A joint venture is an association of two or more persons to carry out a single enterprise for profit." *O'Brien v. Cacciatore*, 227 Ill. App. 3d 836, 843, 591 N.E.2d 1384, 1388-89 (Ill. App. Ct. 1992).  No formal agreement is required. *Id.*, 591 N.E.2d at 1389.  A joint venture's existence may be inferred from the facts and circumstances demonstrating that the parties entered into a joint venture. *Id.*  The parties' intent is the most significant element to consider. *Id.*  To determine whether a joint venture exists, I must consider: (1) the existence of an express or implied agreement to carry on an enterprise; (2) the manifestation of intent to be associated as a joint venture; (3) a joint interest, as shown by the contribution of property, financial resources, effort, skill, or knowledge; (4) a degree of joint proprietorship or mutual right to exercise control over the enterprise; and (5) a provision for the joint sharing of profits and losses. *Id.*; *Trustmark Ins. Co. v. Gen. & Cologne Life Re of Am.*, 424 F.3d 542, 547 (7th Cir. 2005).

RPG alleges that the parties' licensor/licensee relationship "unquestionably grew into a joint venture with respect to at least the Signature Collection."  Specifically, RPG claims that Davis'

relationship with RPG progressed from merely supplying artwork to working with RPG as a full business partner, by virtue of which Davis was involved with developing the strategy to convince the Customer to commit to the Signature Collection project.   RPG contends that this "fundamental change in the parties' relationship was memorialized in the March 22, 2006 renewal" to the parties' license agreement, after which "Davis became an important business partner with RPG."

The parties agree that the March 22 letter renewed their existing relationship.   It extended the parties' license based on the terms and conditions contained therein.   One such term, titled "Key Account Relationships[,]" states:

> KDS shall have the option to be actively involved in the design, development, and presentation of new productions and introductions to all key accounts for RPG (such as Target, Walgreen's) whereby RPG is promoting new designs from KDS.   Such activities may include vendor briefings; [sic] meetings, trade shows, and exhibitions where RPG and such key accounts are meeting to discuss aspects of the business that involve KDS.

RPG characterizes the activities contained in the Key Account Relationships term as "the classic hallmarks of a joint venture," but fails to explain how, if at all, these activities demonstrate the elements of a joint venture.

Moreover, the parties' written contract appears to cover their efforts regarding the Signature Collection.   The March 2006 renewal

also contains a term titled "Permanent Branded Collection[,]" which states that KDS will design and maintain a permanent branded collection of Davis' cards, and RPG will maintain this collection for the duration of its license agreement with KDS. The March 2006 renewal provides a model for the number of cards to be contained in, and the timeframe for, the initial launch as well as subsequent additions. The parties' December 14 and 27 correspondence addresses their efforts with respect to the branded collection. Specifically, KDS communicated its dissatisfaction with RPG's efforts, and in fact accused RPG of breaching the parties' agreement by failing to introduce the dedicated Davis branded collection as planned. In response, RPG acknowledged that it had not been successful in delivering the showcase. The meaning of the contractual term governing the permanent branded collection, and its ultimate significance with relation the Signature Collection Project with the Customer, is disputed. On the limited evidence before me, however, it appears to include, and cover, the Signature Collection.

A factual dispute also exists as to whether Davis agreed to continue her relationship with RPG. If Davis agreed to extend the agreement for another year, she may be bound. It is not clear, however, whether Davis' statement of intent to remain with RPG, if made to Keiser, was intended and understood by the parties to be a commitment. Furthermore, the parties have not addressed their

understanding as to whether an oral agreement to continue their agreement would be binding. In addition, I cannot tell from the declarations before me what the parties contemplated would happen during 2008 with regard to things like the specific signage adopted for the Signature Collection if the agreement terminated on January 1, 2008. The agreement discusses the fact that specific cards could be sold by RPG during the year following termination. It also appears, as discussed above, to address something like the Signature Collection (i.e. the permanent branded collection), but not what would happen to the collection during the transition year following termination. Clearly, a more formal agreement, drafted with lawyer involvement, could have avoided the current problem.

Alternatively, RPG argues that even if the parties were not joint venturers, they nevertheless entered into a confidential relationship whereby Davis owed it a duty not to use or disclose RPG's confidential information. Other than stating that information disclosed to Davis was highly confidential, RPG has not shown how, if at all, any such information was maintained and treated as confidential. Thus, as an alternative to its joint venture argument, RPG also has not shown that a confidential relationship was formed that gave rise to any duties on Davis' part.

Second, regardless of the nature of the parties' relationship, and any attendant duties, RPG also argues that the terms of the

Signature Collection project – including the existence of its agreement with the Customer and the rollout plans – constitute trade secrets entitled to protection under the ITSA. RPG also asserts that, in connection with developing the Signature Collection, Davis had access to "highly confidential information" regarding RPG's market research, strategies, personnel, sales goals, market studies, results, forecasts, and pricing analyses. In addition, Rake attested that the aspects of the Signature Collection that were unknown to competitors include: the number of designs; the nature and design of the cards; the mix of sentiments (i.e. birthday, love, congratulations, thank you); the linear shelf space; the location within stores; the new signage; pricing; sales goals and projections; and revenue forecasts.

    To state a claim under the ITSA, plaintiff must establish: (1) the existence of a trade secret; (2) the misappropriation of the trade secret; and (3) the use of the trade secret in the defendant's business. *See Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265-66 (7th Cir. 1992). On the record presently before me, RPG has not shown the existence of any trade secret. The ITSA defines a trade secret as

> . . . information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally

> known to other persons who can obtain economic
> value from its disclosure or use; and (2) is
> the subject of efforts that are reasonable
> under the circumstances to maintain its
> secrecy or confidentiality.

765 ILL. COMP. STAT. 1065/2(d). Illinois courts also refer to the following common law factors to determine whether a trade secret exists: (1) the extent to which the information is known outside plaintiff's business; (2) the extent to which the information is known by employees and others involved in plaintiff's business; (3) the extent of measures taken to guard the information's secrecy; (4) the value of the information to plaintiff's business and its competitors; (5) the amount of time, effort, and money plaintiff expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated. *Delta Med. Sys. v. Mid-Am. Med. Sys., Inc.*, 331 Ill. App. 3d 777, 789, 772 N.E.2d 768, 780 (Ill. App. Ct. 2002). Here, RPG contends that its highly confidential information "unquestionably constitutes trade secrets." But it does not explain why this so.

RPG has made no showing that its information was secret or that any efforts, let alone reasonable efforts, were taken to maintain its secrecy. Some of the information might well be trade secret, but RPG has not indicated anything was done to keep it secret. Meanwhile, Davis attests that RPG never indicated, through a confidentiality agreement or otherwise, that the fact that the

Signature Collection was going to be marketed to the Customer should be treated confidentially.  On her September 2007 blog, Davis wrote that she was " . . . working on . . . most importantly, a new collection of Kathy Davis greeting cards for Target!"  Davis attests that KDI informed RPG of its efforts to promote the test launch and the Signature Collection through its website, mailings, and the creation and dissemination of a custom designed postage stamp, and RPG never objected to or expressed concern about these measures.  Davis also attests that KDI had a permanent card display in its studio featuring mock ups of the Signature Collection for visitors to see.  Davis further attests that upon seeing this display during a visit on October 22, 2007, RPG executives did not indicate to KDI that the information was confidential or that RPG intended to keep the test launch or the Signature Collection confidential.  Rake attests that the board displayed in October could not have shown the Signature Collection because the final details were not resolved until November 21, 2007 when Davis delivered the approved designs to RPG.  Walts, Vice President of KDI, attests that the concept of marketing Davis' cards as part of a collection was not being done for the first time with the Signature Collection.  Rather, Walts attests that Davis' cards have previously been displayed collectively. Walts attaches photographs of:  a public display of Davis' cards in the Dreshertown Shop N'Bag on January 20, 2008; Davis in front of a collection of her cards at

16

the National Stationery Show in May 1997; and collections of cards advertised by RPG as early as February 2001.

RPG also has not shown that any trade secret has been, or will be, misappropriated. RPG asserts that Davis already has disclosed, intends to disclose, or inevitably will disclose its trade secrets to American Greetings. Ultimately, regardless of whether RPG's information qualifies as a trade secret, Davis attests that neither she, nor anyone associated with KDI, has disclosed or will disclose RPG's confidential or trade secret information to American Greetings or any other person or entity.

RPG further claims Davis "unquestionably" was pursuing the "launch" of the Signature Collection with American Greetings while she was working with RPG to roll out the Signature Collection project to the Customer. RPG refers to, but does not attach, Davis' December 28, 2007 termination letter and a follow up letter dated January 4, 2008 as the basis for its assertion that Davis intends to launch the Signature Collection with American Greetings. Davis attached copies of these letters to her declaration. Contrary to the allegation in the verified complaint, the January 4 letter does not advise RPG that "American Greetings is 'making a significant commitment to launch and market' the Signature Collection 'in a meaningful way.'" Rather, the letter states Davis' new "partner is making a significant commitment to launch and market [her] brand in a meaningful way, with not only cards,

17

but also related product and gift collections, both in the retail environment and online." Moreover, Davis attests that KDI has no intention to license or otherwise market or sell any of the 60 greeting cards that comprise the Signature Collection during the calendar year 2008. Davis also attests that KDI has negotiated a license agreement with American Greetings that does not include, for the calendar year 2008, any of the Signature Collection cards.

Jeffrey Weiss ("Weiss"), President and Chief Operating Officer of American Greetings, attests that, on or about December 11, 2007, he met with Davis and others from KDI. Consistent with Davis' declaration that KDI did not disclose RPG's confidential information, Weiss attests that at no time during that meeting or any other discussions with the KDI team did KDI ever disclose or discuss: RPG contract terms, negotiations, discussions, or communications with any RPG customer; information concerning RPG's corporate operations or strategic planning, including personnel strategies, customer strategies, consumer strategies, or competitive strategies; or any of RPG's market surveys, market analysis, pricing, product development, or sales techniques.

Further, Davis attests that, at the December 2007 meeting, KDI presented boards of artwork, one of which included a "rendering of the Signature Collection[,]" which also was displayed in its studio, as during RPG's October 2007 visit to KDI. If this rendering was the same as the board displayed in KDI's office in

18

October, then according to Rake it could not contain the Signature Collection cards. But if this rendering in fact contained the Signature Collection cards, then there may have been a disclosure of RPG's information. These facts are disputed, and can be resolved upon presentation of further evidence at a hearing. Davis also attests that KDI told American Greetings that a new collection of Davis' cards was being tested for the Customer in early spring 2008, which also had appeared on Davis' blog. Weiss likewise attests that the KDI team stated that a new collection of Davis' cards was being tested for the Customer in early spring 2008. Given that the Signature Collection cards are excluded from the KDI/American Greetings licensing agreement and that RPG has not shown that the fact of the Signature Collection's existence or the project with the Customer were confidential or trade secrets, RPG has not shown that the disclosure of this information constitutes misappropriation.

Finally, RPG addressed the likelihood of success on its remaining claims in a cursory fashion. RPG asserts that it will succeed on its breach of contract, intentional and/or negligent misrepresentation, and promissory estoppel claims.

RPG contends that it will succeed on its breach of contract claim because (1) Davis attempted to terminate the license agreement in violation of its express termination provision, and (2) Davis admitted to working with American Greetings in violation

19

of the license agreement. RPG does not elaborate. First, pursuant
to the March 22, 2006 renewal, the license agreement permits KDS to
terminate it on January 1, 2008. RPG alleges in the verified
complaint that Davis violated this provision because her
termination letter was dated December 28, 2007 - four days prior to
the termination date. The contract is silent, however, as to how
to communicate the termination. Second, RPG alleges in the
verified complaint that, pursuant to the October 17, 1995 renewal,
the license agreement became exclusive, and "Davis was to continue
to 'avoid working with' any company that competed directly with
RPG." RPG did not attach a copy of the October 1995 renewal, but
Davis did. The October 1995 renewal actually reads: "Over the
years we've modified our non-exclusive agreement as follows: RPG is
definitely the primary greeting card publisher of your cards and
you have avoided working with any companies that compete directly
with RPG in the retail marketplace . . . . " Neither of these
arguments demonstrates that RPG is likely to succeed on its breach
of contract claim. In addition, Davis asserts that RPG materially
breached the parties' contract by failing to fulfill its
obligations concerning the permanent branded collection.

RPG argues that it will succeed on its intentional or
negligent misrepresentation claim because Davis assured RPG of the
parties' continuing relationship while shopping the Signature
Collection to American Greetings. First, RPG knew that Davis could

20

terminate the parties' contract on January 1, 2008. The parties dispute, however, whether Davis assured RPG of their continuing relationship despite the termination provision. Rake attests that he offered Davis the option to remain with RPG and to terminate the contract at the end of 2008. And Keiser attests that Davis told him she intended to stay with RPG for another year. But Davis' declaration and the documents attached thereto contradict RPG's argument that Davis assured it of a continuing relationship. In the December 14 letter, KDI stated that it required clarification of certain issues before it could consider continuing the current agreement, indicated that it was considering offers from other potential partners to market its cards and products, and requested a prompt response from RPG in light of the upcoming termination date. Second, as set forth above, Davis' and Weiss' declarations contradict the argument that Davis was shopping the Signature Collection to American Greetings. Alternatively, RPG argues that, even if Davis' misrepresentations were not intentional, she nevertheless owed a fiduciary duty to RPG to fully disclose her discussions with American Greetings. As set forth above, RPG has not shown that the Davis owed RPG any fiduciary duties.

RPG asserts that it will succeed on its promissory estoppel claim because Davis represented that she would remain with RPG, and as a result RPG continued to invest substantial resources and goodwill in the Signature Collection Project. As explained above,

a factual dispute exists as to whether Davis represented that she would remain with RPG. The timing of the various communications also leaves open a serious question about what RPG may have done in reliance on any communication by Davis of her intention to remain with RPG given the short period of time between when the statement is said to have been made and when documents of record appear clearly to show that Davis was thinking of terminating the parties' relationship.

IV.

For the foregoing reasons, RPG's motion for temporary restraining order is denied. RPG's motion for preliminary injunction is entered and continued pending the completion of expedited discovery.

**ENTER ORDER:**

_____
      **Elaine E. Bucklo**
     United States District Judge

Dated: February 1, 2008