IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RECYCLED PAPER GREETINGS, INC., an Illinois Corporation, | ) ) ) | |
| plaintiff, | ) ) | Case No. 08-C-236 |
| | ) | Judge Elaine B. Bucklo |
| v. | ) ) | Magistrate Judge Morton Denlow |
| KATHY DAVIS, | ) ) | |
| defendant. | ) ) | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

**<u>The Parties</u>**

1.      Plaintiff Recycled Paper Greetings, Inc. ("RPG") is an Illinois corporation with its principal place of business at 111 N. Canal Street, Suite 700, Chicago, Illinois 60606.

2.      Defendant Kathy Davis ("Davis") is a resident of the Commonwealth of Pennsylvania, residing at 1045 Limekiln Pike, Ambler, Pennsylvania, 19002. Davis has conducted business with RPG in her individual capacity and, at various times, using the d/b/a "Kathy Davis Designs" and/or "Kathy Davis Studios."

**<u>Jurisdiction and Venue</u>**

3.      This Court has personal jurisdiction over Davis because she transacts business in Illinois and has breached and will continue to breach contractual and fiduciary obligations to RPG in Illinois. Subject matter jurisdiction exists under 28 U.S.C. §1332, because the amount in controversy exceeds $75,000, and because Davis and RPG are citizens of different states.

4.      Venue is proper in this Court pursuant to 28 U.S.C. §1391, because the claim substantially arises out of incidents or events occurring in this judicial district.

**Introduction**

5.      This matter arose because Davis took a proprietary business arrangement conceived and developed jointly with RPG, and shopped it to RPG's competitor, American Greetings, for her own benefit and to the direct detriment of RPG.

6.      Equally problematic, Davis' actions occurred just after she told RPG that she intended to remain under contract with RPG for another year, and at a time when RPG was in the final stages of rolling out with one of its largest customers the very concept that Davis wrongfully disclosed to American Greetings.

7.      By this action, RPG thus seeks to: (a) restrain Davis from disclosing and/or delivering in whole or in part to American Greetings the trade secrets and confidential and proprietary information of RPG; (b) recover damages caused by the defendant's unlawful actions; and (c) pursue other common law and statutory claims against the defendant.

**Statement of Facts**

**Recycled Paper Greetings**

8.      RPG was founded in 1971, and is in the business of selling greeting cards.

9.      The original business concept was to introduce greeting cards on 100% recycled paper and thereby persuade consumers and the card industry generally to accept the environmental wisdom of using recycled paper for greeting cards.  The "industry giants" are RPG's two main competitors, Hallmark and American Greetings, which together dominate the greeting card industry.

10.      Begun in a college dormitory, over the course of thirty-plus years RPG has grown to become the number three greeting card company, although its market share remains small

compared to the industry giants.  RPG's success is derived from its use of independent artists, whose original designs are the lifeblood of the company.

## Kathy Davis

11.    Davis is an artist in the business of designing and creating greeting cards.

12.    Beginning in 1990, Davis and RPG established and have maintained a mutually-beneficial business relationship whereby, among other things, Davis licenses her work to RPG and RPG sells cards created by Davis.  As Davis' own website boasts, her "success with Recycled Paper Greetings has blossomed and today she ranks as their number one selling non-humor artist."

13.    Davis' website claim is accurate: over the years, RPG invested a significant amount of time, effort and money in promoting, establishing and maintaining the Kathy Davis brand.  As a result, Davis' cards now constitute a significant portion of RPG's portfolio.

14.    As discussed more fully below, RPG's relationship with Davis is governed, in part, by a written contract, and RPG has certain rights, arising from that contract, to the exclusive use of Davis' artwork and designs.  In 2007, the parties also formed a common law joint venture, the essential fruits of which are the planned rollout of the so-called "Signature Card Collection."

15.    Consequently, RPG has a legitimate interest in protecting the fruits of its contractual and business relationships with Davis.

## The Written Contractual Agreements

16.    The relationship between the parties began on or about November 30, 1990, when Davis entered into a license agreement with RPG ("the License Agreement").  See Exhibit A. Pursuant to the License Agreement, Davis agreed, for an initial period of five years, to provide designs, drawings and artwork for greeting cards to be manufactured and sold by RPG.

3Chicago 89980.1

17.     The original License Agreement was in the form of a letter agreement from one of the founders of RPG, Mike Keiser, to Davis.

18.     The License Agreement was renewed by the parties on multiple occasions.  As with the original letter that memorialized the terms of their licensing agreement, subsequent renewals were accomplished by somewhat informal letter agreements between Ms. Davis and Mr. Keiser.  Specifically, the License Agreement was renewed on or about: October 17, 1995; December 1, 2000; and March 22, 2006 (retroactive to January 1, 2006).  See, respectively, Exhibits B, C and D.

19.     Under the October 17, 1995 Renewal, the License Agreement became exclusive with respect to most greeting cards produced by Davis (including those that are issue in this litigation).  Specifically, at all relevant times, and as reflected by paragraph 3 of the October 1995 Renewal, Davis understood that she could not sell to any competitor of RPG any card design licensed to RPG, without RPG's express approval.

20.     Over the years, with RPG's support and its investment of time and resources, Davis evolved into more than just an artist and card designer.  She became a businessperson as well: forming a corporation; opening her own studio; hiring employees; and developing brands and social expression products in addition to greeting cards.

21.     In early 2006, Davis requested the "opportunity" to be involved at times in "Key Account Relationships," including "the design, development and presentation of new products and introductions to all key accounts for RPG."  This included "vendor briefings, meetings, trade shows and exhibitions."  See Ex. D, March 2, 2006 Renewal.

22.     The March 22, 2006 Renewal did not, however, establish the specific terms of any future relationships, other than the relationship of licensor/licensee, or how such potential future

relationships would operate.  It was, in essence, an "agreement to agree" on doing future, new endeavors together when and if as yet unknown opportunities arose.

### The Signature Card Collection Oral Joint Venture Agreement

23.     In or about May of 2005, Davis created a concept of thematically-related designs which she coined "Scatter Joy."  Scatter Joy is an uplifting, inspirational line of cards and related social expression products which represent, as Davis describes it, her mission to "Scatter Joy – Joy through Art, Joy through Living, Joy through Giving!"

24.     For over a year, RPG sold Davis' Scatter Joy cards individually, just like any other greeting card in its portfolio.

25.     In the summer of 2007, Jude Rake, RPG's Chief Executive Officer, made a strategic business decision to develop and market the Scatter Joy brand as a "signature collection" or Kathy Davis "showcase."  The decision was also made by RPG at that time to initially market this new business idea to only one of RPG's largest customers (the "Customer").

26.     The resultant propriety business plan, including the deal struck with the Customer, is the subject of this litigation.

27.     Wholly separate and apart from the March 22 Renewal or Davis' Licensor/Licensee relationship with RPG, RPG embarked upon an effort to create, design and sell to its (not Davis') Customer a Signature Card Collection.  Davis joined in that effort as an equal partner and, as a result, a joint venture was formed between Davis and RPG (the "Joint Venture").

28.     Generically, the concept was to take a number of Scatter Joy cards (selected by RPG based on RPG's confidential sales data and by applying a business or marketing formula that involved using an ideal mix of price points, designs, colors and sentiments), arrange them in

a specific manner in a particular aisle location in the Customer's stores, covering an agreed upon amount of shelf space, and then highlight that display with unique signage.

29.    The Signature Card Collection concept was separate and distinct from the "permanent branded collection" obligations addressed in the License Agreement, and it arose not out of any contractual obligation but from a strategic business idea that became the subject of the Joint Venture.  Put another way, the "permanent branded collection" term of the March 22 Renewal Agreement is different from, and does not apply to, the Signature Card Collection.

30.    While the idea of featuring a collection of cards, generally, was not new, the cards selected and the manner and sales method ultimately proposed to the Customer were unique, new and not publicly known.

31.    RPG asked Davis, and she agreed, to assist RPG with the development and pitching of the Signature Card Collection.  Davis was intimately involved in developing the business strategy used to sell the Customer on the Signature Card Collection project.  Among other things, Davis traveled to RPG's corporate headquarters in Chicago at the end of July, 2007, to present the proposal to the Customer jointly with RPG.  None of these actions was "governed" by the March 22 Renewal.

32.    Davis describes the venture as "a collaborative effort," and it was in fact so.  Both parties contributed their skills to the Joint Venture.  Davis' contribution to the resultant Joint Venture and oral Joint Venture Agreement included the art and designs for the card collection, and giving RPG the right to use her name, image (if possible) and the trademarked phrase "Scatter Joy" in connection with the public display of the Collection.  As detailed below, RPG's contributions were on the business and marketing side of the deal, including working with Davis to make necessary adjustments to the artwork.

33.     Neither of the parties could have accomplished the deal without the participation of the other.  In that regard, they were true partners.  In fact, Davis contends that she – not RPG – was the driving force in creating the Signature Card Collection.

34.     Nothing in the License Agreement required Davis and RPG to partner in this way. Rather, the parties mutually recognized a joint opportunity and seized upon it as business partners.

35.     The result of this Joint Venture partnership was an oral agreement among Davis, RPG and RPG's Customer concerning the development, promotion and sale of the Signature Card Collection, the terms of which -what Davis calls "the particulars"- were highly confidential.

36.     After the pitch to the Customer at the end of July 2007, RPG devoted even more time and resources to the Signature Card Collection project, planning for a product launch in hundreds of locations as early as February of 2008, and nationally thereafter.

37.     Beginning in August of 2007, RPG employees – including Product Manager Noelle Shannon and Art Coordinator Gretchen Hoffman – were in almost-daily contact with Davis and/or her employees in planning for the Signature Card Collection launch.  This regular contact concerned the intricate details of the project, from card selection, to design proposals, to the proper mix and balance of the Collection, to pricing, to deadlines and scheduling.

38.     From the outset, the proprietary nature of this project was clear to everyone involved, including Davis.  This was not a plan simply to throw a random handful of Davis cards onto store shelves and hope they sold well.  Rather, RPG and Davis: (i) negotiated for and obtained a designated amount of dedicated shelf space from the Customer (which Davis, when she heard of the Customer's commitment, described as "great news!"); (ii) determined the number of cards that would go into that space; (iii) determined the mix of sentiments that would

be included in the designated space; (iv) determined, using RPG's sales and marketing data (not previously available to Davis), what existing cards should be selected for the Collection; (v) determined what new card designs should be put in the mix; (vi) determined what "color foils" should be used; (vii) determined what signage would be used to market the Collection (and that would be acceptable to the Customer), and designed such signage; and (viii) determined the appropriate range of price points for the Collection (collectively, the "Collection Elements").

39.    RPG, not Davis, had the necessary sales information to determine which cards should be included in the Collection.  RPG, not Davis, selected the range of price points.  RPG, not Davis, determined what the sentiment mix would be.  RPG, not Davis, had the Customer as a client.  RPG, not Davis, was to pay for the allotted shelf space, as well as the costs of manufacturing and distributing the Cards.  Davis supplied her card designs (some of which were modified at RPG's request), and agreed to allow RPG to use her name and the Scatter Joy name.

40.    From the moment the Customer committed to the Joint Venture project, Davis knew that the deal with the Customer, including the amount of the allotted shelf space, was confidential.  Indeed, Davis took notes of her conversation with RPG on the day she was told by RPG how much shelf space would be allotted to the Collection at the Customer's stores, and *she* labeled those notes *"confidential."*

41.    *None* of the Collection Elements was known publicly or disclosed; that is, until Davis wrongfully disclosed the Collection Elements as part of her wrongful efforts to obtain an agreement for herself with American Greetings.

42.    Moreover, it is absolutely understood in the greeting card industry that an artist working as Davis did with RPG would not disclose to that company's competitors the details of any as-yet unreleased projects.

43.     As noted, Davis knew the Collection Elements were confidential and she never publicly disclosed *any* of those Elements to anyone before meeting with American Greetings. For example, although Davis wrote generally on her blog in the late-summer of 2007, that she had a new collection coming out in the spring, that "fact" was the only "disclosure" made, and it was made or written over two months *before* the Elements of the Signature Card Collection were finalized.  Indeed, Davis' blog entry said absolutely nothing, other than that she had a "favorite new project" with the Customer.  See Exhibit E.

44.     Regular and ongoing contact between RPG and Davis on the planning details of the Signature Card Collection project continued throughout August, September, October, November and December of 2007.

45.     On November 21, 2007, Davis completed the final artwork on the Signature Collection Cards and submitted those designs to RPG.  It was not until that moment, November 21, 2007, that the Collection Elements were finalized (save additional or potential adjustments to signage).  RPG then moved forward with production.

46.     Thus, until American Greetings appeared on the scene, the interests of RPG and Davis with respect to the Signature Card Collection were inseparable.  It is equally certain that no one other than Davis, RPG and the Customer knew of the Collection Elements, and that those Elements, but for Davis' improper disclosures, were not known by American Greetings.

47.     Moreover, the disclosure of the Collection Elements by Davis to American Greetings gave American Greetings a significant, unfair competitive advantage.

### Davis' Commitment to Remain with RPG and the Attempted Termination

48.     Under the March 22, 2006 Renewal, Davis retained a very limited right to terminate the License Agreement:  "upon the first and second anniversary dates" of the Renewal

(*i.e.*, January 1, 2007 and January 1, 2008). Davis did not terminate the License Agreement on January 1, 2007.

49.    Davis drafted the March 22 Renewal, and its terms are clear and unambiguous: termination could occur only and solely "upon" the first and second anniversary dates.

50.    During the latter half of 2007, RPG and Davis began to discuss terms and expectations for their continued relationship, knowing that the second anniversary date under the March 22 Renewal was approaching.

51.    To put these discussions and meetings in context, the manner in which RPG operates must be understood. RPG is not a large, diversified conglomerate like its main competitors, Hallmark and American Greetings. RPG was founded in a college dorm room and was run by its founders for most of the life of the company. It is still a small organization and it retains an informal, collegial atmosphere.

52.    The company's discussions with Davis in 2007 proceeded with that same spirit of mutual cooperation and benefit. These were not tense meetings or hard-bargaining sessions with legal counsel involved; rather, the parties discussed their expectations just as they always had in the past.

53.    Davis did inform RPG in October of 2007 that she had been approached by a competitor of RPG, American Greetings. Davis told RPG executives that American Greetings was interested in licensing her designs, but Davis failed to disclose to RPG the details of her discussions, if any, with American Greetings. Had she in fact done so, RPG's relationship with Davis – and the manner in which it was negotiating with her – would have changed materially, as RPG was at that time deep into the process of developing with Davis the Joint Venture roll-out. To be sure, RPG would not have continued investing significant resources in October, November

and December of 2007 in rolling out a collection of Davis's greeting cards if RPG had been made privy to the details of Davis' discussions with American Greetings.

54.    This point cannot be emphasized enough.  The Joint Venture project was not related in any way to the License Agreement and, therefore, was not contingent upon Davis extending or renewing the March 22 Renewal.  The only "overlap" was that RPG would be significantly injured if Davis, while the Collection was being rolled out, decided to license her cards to an RPG competitor and not to RPG.

55.    In other words, RPG had no desire to showcase Davis or the Scatter Joy product if, at the same time, Davis was going to be featured, perhaps in the same stores, under the banner of an RPG competitor.  Davis understood this to be the case.

56.    Davis never once expressed to RPG that it ought to make contingency plans, or put the project on hold pending her "decision" on termination.  *Not once* did she say anything to the effect of "we should hold off on this project because I might not be here in 2008."  To the contrary, Davis' actions indicated to RPG that she was staying.  Indeed, Davis and her studio were actively moving forward with and participating in the Joint Venture project all the way up to the date of her purported termination at the end of December, 2007.

57.    As part of this process, RPG shared highly confidential corporate information with Davis in meetings with her in the Fall of 2007, including but not limited to strategic business plans and profit reports, market research, market studies, pricing plans, personnel strategies and consumer strategies.  RPG shared this information with Davis in order to facilitate discussions regarding past sales performance and future opportunities for growth.

58.    The information shown to her was proprietary and was not known outside the company, and certainly not to any competitors.  This information was shown to Davis via

PowerPoint slide presentations, the pages of which were marked "confidential." Davis knew and understood that the information being shared with her was highly confidential. By way of example, on more than one occasion, Mr. Rake, in his meetings with Davis, informed her that the information he was sharing with her was "confidential" or "very sensitive."

59.    It is in this context that Davis had a telephone conversation after Thanksgiving of 2007, after she had just delivered to RPG the final designs for the Signature Card Collection, with Mr. Keiser, the person most responsible for nurturing and developing Davis' career as a greeting card artist.

60.    During the course of that conversation Davis, in the exact same manner in which she had done every time the topic arose over the past 17 years, told Mr. Keiser that it was her "intention" to remain with RPG for another year. Never before had Davis given any more of a "formal" commitment to Keiser or RPG, save only for when the License was renewed by way of a letter agreement. As Davis knew, or should have known, her statement to Mr. Keiser would be understood in only one way; namely, that she was staying with RPG through at least the end of 2008.

61.    Equally important, Davis gave no indication whatsoever that she was planning to have any further discussions with American Greetings. This combination -a declared intention to stay, silence regarding the continuing discussions with American Greetings, the delivery of the final Collection designs and the ongoing, almost daily efforts of her Studio to roll out the Signature Card Collection- wrongfully induced RPG to continue developing the Signature Card Collection and to forgo taking steps to protect itself in the event of Davis' soon-to-be imminent departure.

62.    Following that telephone conversation, Mr. Keiser reported Davis' intentions to Mr. Rake.  Mr. Rake, in turn, reported to the Board of Directors at its December meeting that Davis would remain with RPG.

63.    Based on that conversation, as well as an uninterrupted seventeen-year business relationship and Davis' continued active involvement in the development and rolling out of the Signature Card Collection, RPG's executives and Board members reasonably believed that Davis would not be exercising the termination option on the second anniversary date.

64.    In reliance thereon, RPG took and continued taking a number of significant actions.  Among other things, RPG did not put in place any "backup" or contingency plans in anticipation of a potential January 1, 2008 termination.  Timely replacing the committed shelf space, not to mention Davis' products generally, would have required an immediate and substantial investment in other artists and their work.  This was critical as, with one customer alone, Davis was to represent a significant amount of RPG's total shelf space; space that would otherwise need to be filled by other artists.

65.    RPG also continued to move forward with the Signature Card Collection project. Significantly, RPG did not advise its major corporate Customer that there was any risk the Collection would not roll out as planned or that, when it was rolled out, Davis might be featured in the Customer's stores…by an RPG competitor.

66.    Not only did RPG continue to move forward with the Signature Card Collection through the month of December, but *so did Davis*.  Davis' employees were in constant communication with RPG throughout December regarding various aspects of the project, including signage.

67.     Unbeknownst at the time to RPG, Davis traveled to Cleveland, Ohio to meet with American Greetings on December 11, 2007 (the "December 11 Meeting").

68.     At the December 11 Meeting, Davis, for the first time, and improperly, disclosed the Collection Elements.

69.     Specifically, Davis brought with her the *exact board mock-up* of what had just been delivered to RPG.  At the December 11 Meeting, as part of her presentation, Davis put that board on an easel so that the American Greetings executives in attendance could see the number of cards in the Collection, the designs selected, the sentiments chosen and the actual and anticipated signage.

70.     Davis had never before disclosed the Collection Elements, and had no permission from RPG to do so.  The Elements were not known publicly, or by American Greetings.

71.     On or about December 14, 2007, executives from American Greetings traveled to meet Davis at her Pennsylvania studio.

72.     Incredibly, following just two meetings with American Greetings, American Greetings advised Davis that it suddenly had a "unique" opportunity, perfectly suited for Davis, *with the Customer*.  American Greetings even requested that Davis provide American Greetings with the mock-up display of the Signature Card Collection that Davis had created to use *with RPG to pitch the RPG Customer* in July 2007.

73.     On December 14, 2007, the same day that Davis was meeting in her Studio with American Greetings, Davis' husband, Peter Walts, sent a letter to RPG with a list of supposed demands that he claimed were "critical" (the "December 14 Letter").  See Exhibit G.  That Letter was a sham, sent to mislead RPG and to cover up Davis' wrongful actions with American Greetings.

74.    RPG gave little credence to the supposed threat of termination contained in the December 14 Letter.  First, it came from Mr. Walts, and not from Davis or from the President of her company, John Mavrakis.  Second, the Letter from Mr. Walts simply regurgitated old, rejected or already addressed demands.  For example, no one at RPG believed that Davis would jettison a seventeen year relationship if she was not given a "written job description" for the in-house art person at RPG who would be assigned to assist her.

75.    Put bluntly, RPG viewed the December 14 Letter as Mr. Walts' effort to shake out additional financial concessions, as he had a history of attempting to do.  In light of what Davis had just said to Mr. Keiser, and given the daily and ongoing efforts of Davis' Studios, RPG did not believe for one moment that the Letter was really a "do or die" threat.

76.    RPG's beliefs about the true purpose of the December 14 Letter have since been confirmed.  *None* of the supposedly "critical" things that Davis needed to know were even *discussed*, let alone detailed, by American Greetings before Davis accepted American Greetings' offer.  Suddenly, what was so "critical" as regards RPG, was not even worthy of discussion with American Greetings.

77.    RPG responded to Mr. Walts' letter on December 27.  <u>See</u> <u>Ex.</u> G.  Reflecting RPG's belief that Davis intended to remain with RPG, the responsive document was entitled "Partnering for Growth – Replies to KDS Inquiries."  The author of the document, RPG's Chief Marketing Officer, concluded by stating that, "I hope this provides clarification to the original 'Mutual Agreement'… I am excited to be working with you, and hope we can set both parties up for long term success!"

78.    Thus, as far as RPG was concerned, its December 27 document was a response to specific questions, not a "final offer" that Davis would either accept or decline.

79.     By letter dated December 28, 2007 -not the established termination date of January 1, 2008- and in direct contravention of her earlier stated intention, Davis purported to terminate her relationship with RPG.  However, the Agreement is clear, and was drafted by Davis:  it had to be terminated "upon" January 1, 2008.

80.     As a result, Davis' purported termination was invalid and ineffective.

81.     In her supposed termination letter, Davis stated that she had "decided to pursue a *different path* in the future with another company," and that she had already "agreed to economic terms" that "meet my personal financial goals." (Emphasis supplied.)  RPG has since discovered that the "company" referred to by Davis is American Greetings.

82.     More troubling, RPG has learned and discovered that the "path" Davis will be pursuing is not "different."  To the contrary, Davis intends to pursue the exact same "path" paved by RPG.

83.     Had RPG not filed the instant lawsuit, Davis would have delivered wholesale to American Greetings the greeting cards licensed to RPG and the Signature Card Collection concept developed with RPG.

84.     Upon information and belief, Davis and American Greetings planned and/or are still planning to sell a "collection" of Davis cards to the very customer that RPG persuaded to roll-out the Signature Card Collection.  This belief is based on, among other things, American Greetings' request to Davis for the mock-up display shown to that Customer, as well as American Greetings' discussions with Davis regarding a "unique opportunity" with the same Customer.  American Greetings also now has, or is attempting to obtain and use licenses to greeting card designs that Davis licensed to RPG.

85.     RPG is now in the position of having to fulfill a major corporate commitment to one of its largest customers at a moment when Davis is apparently preparing to "launch" a card "collection" with one of RPG's prime competitors and, most likely, to do so at least in part with the same Customer that agreed, with RPG, to commit to the Signature Card Collection.  Should Davis and American Greetings "succeed" in that "competition," it would be because of RPG's efforts.

86.     For Davis to launch a Scatter Joy "Collection" with American Greetings generally, let alone with the Customer with which RPG reached agreement, she will have to disclose to American Greetings RPG's confidential and proprietary plans and arrangements.  At minimum, American Greetings will be able to use RPG's trade secret information to improperly compete with and cause further irreparable harm to RPG.

87.     As such, RPG will suffer a substantial loss of goodwill and will be improperly and unfairly forced to compete with an entity, American Greetings, which will be in possession of RPG's highly confidential trade secret information.  Under no circumstances should an exclusive licensor and co-venture partner such as Davis be permitted to deliver such information wholesale to an RPG competitor.

### COUNT I
#### (Breach of Contract -- Licensing Agreement)

88.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 87 above, as if set forth fully herein.

89.     Davis was party to a written contract with RPG.

90.     For the reasons detailed herein, Davis breached her contractual obligations to RPG.  Specifically, Davis purported to terminate the License Agreement on a date not permitted under the License Agreement.  Moreover, Davis has licensed or is attempting to license her

greeting card designs to American Greetings in violation of the March 22 Renewal.

91.    Further, the License Agreement to which Davis was a party contained the implied covenants of good faith and fair dealing.

92.    Davis breached the covenants of good faith and fair dealing by taking the actions described herein, including but not limited to: shopping the Signature Card Collection to American Greetings at a time when she was still party to an exclusive licensing contract with RPG; inducing RPG to continue its efforts as regards the Signature Card Collection even as she was making plans to terminate the License Agreement with RPG; and inducing and/or attempting to induce RPG to expend resources on her even as she sought a better deal from American Greetings.

93.    RPG has suffered damages as result of Davis' breach of contract in an amount to be proved at trial.

## COUNT II
### (Breach of Contract – Oral Joint Venture Agreement)

94.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 93 above, as if set forth fully herein.

95.    Davis was party to an oral, common law joint venture agreement with RPG.

96.    For the reasons detailed herein, Davis breached her joint venture obligations to RPG by, among other things, disclosing and attempting to deliver to American Greetings, RPG's direct competitor, the essence of the Joint Venture; namely, the Signature Card Collection and the Collection Elements thereof.

97.    RPG has suffered damages as result of Davis' breach in an amount to be proved at trial.

## <u>COUNT III</u>
**(Intentional and/or Negligent Misrepresentation)**

98.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 97 above, as if set forth fully herein.

99.     Davis represented to RPG in early December 2007 that she intended to remain under contract with RPG.  Davis also: delivered to RPG all of the final Collection designs; had her Studio work continuously and actively with RPG in connection with efforts to roll out the Collection; and told RPG about her initial contact with American Greetings, but failed to fully disclose the extent or detail of her discussions with American Greetings.

100.    Davis' representation was knowingly false and/or reckless and/or negligent as Davis knew or should have so known.

101.    The misrepresentation was material and was made in the hope that RPG would continue its investment in Davis' artwork and designs, particularly in the Signature Card Collection on which RPG was actively moving forward.

102.    In the alternative, Davis failed to disclose or provide adequate information to RPG while under a duty to provide such information to RPG, knowing as she did that RPG was investing significant resources in developing and rolling out the Signature Card Collection. Davis failed to communicate to RPG material information upon which RPG may reasonably have been expected to rely in the conduct of its economic affairs.  The material information that Davis failed to disclose was that she was meeting with and listening to offers from American Greetings at the very same time that she and RPG were moving forward with the Signature Card Collection.

103.    RPG did, in fact, reasonably rely on Davis' misrepresentations and/or omissions.

104.    By virtue of the foregoing, RPG has been damaged.

105.    Consequently, RPG is entitled to damages in an amount to be proved at trial. together with interest, costs and attorneys' fees to the extent permitted by law.

**COUNT IV**
**(Violation of Illinois Trade Secrets Act)**

106.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 105 above.

107.    RPG reposed its trust and confidence in Davis by disclosing to her, and allowing her access to, RPG's confidential information.

108.    The Collection Elements are trade secrets of RPG and/or the Joint Venture. Although various (but not all) aspects of the Collection Elements had appeared in public before (e.g., cards in the Collection had been sold individually), the Collection Elements had never before been assembled , organized or compiled in the manner which resulted in the Signature Card Collection, nor with the Customer's agreement to roll out that Collection in its stores.

109.    The secret combination of these Collection Elements resulted from, among other things, the use of RPG's confidential marketing information, such as prior sales, and RPG's expertise, and was not known publicly by anyone, let alone to American Greetings.

110.    The Collection Elements -the amount of dedicated shelf space, the number of cards to be included in the project, the mix of cards to be included by design, the selected sentiment mix, the price range of the Cards that would be available to the consumer, and the signage for the project -were not known publicly and were of great competitive value to RPG and/or the Joint Venture.

111.    The Collection Elements constitute trade secrets entitled to protection under the Illinois Trade Secrets Act, 765 ILCS 1065/1, et seq.

112.    This information provides actual and/or potential economic value to RPG.

113. This information was kept secret by RPG and was not generally known or available to other persons, and Davis knew it was confidential.

114. This information was subject to reasonable security measures to maintain secrecy and confidentiality.

115. Davis threatens to misappropriate and/or actually has misappropriated RPG's and/or the Joint Venture's trade secrets, and has used and/or is planning to use them by taking and converting said information and delivering it to American Greetings.

116. As a direct and proximate result of Davis' wrongful conduct, RPG has been damaged.

117. Consequently, RPG is entitled to damages in an amount to be proved at trial, together with interest, costs and attorneys' fees to the extent permitted by law.

## <u>COUNT V</u>
### (Breach of Fiduciary Duty)

118. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 117 above, as if set forth fully herein.

119. Davis owed and continues to owe RPG fiduciary duties by virtue of her status as an exclusive licensor, by virtue of her status as a Joint Venture partner of RPG, by virtue of the highly confidential information she possesses, and by virtue of the trust and confidence that RPG reposed in her.

120. Those fiduciary duties include, without limitation, an obligation not to reveal or disclose to a third party RPG's confidential information or trade secrets.

121. Davis breached her fiduciary duties by using and disclosing RPG's and/or the Joint Venture's confidential information and trade secrets.

122. Davis' fiduciary duties also include a duty of loyalty to RPG.

123.    Davis further breached her fiduciary duties by taking the actions described herein.

124.    RPG has been damaged by Davis' breach of her fiduciary duties and duty of loyalty in an amount to be proved at trial.

**COUNT VI**
**(Promissory Estoppel)**

125.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 124 above.

126.    Davis made the unambiguous promise that she intended to remain under contract with RPG.

127.    In the alternative, Davis failed to disclose or provide adequate information to RPG while under a duty to so provide such information to RPG, knowing as she did that RPG was investing significant resources in developing and rolling out the Signature Card Collection.

128.    RPG relied on Davis' promises/failures to disclose.

129.    RPG's reliance was expected and foreseeable from Davis' perspective.

130.    RPG's reliance on Davis' promises and failure to disclose was detrimental.

131.    RPG is entitled to recover damages for the profits it would have made had Davis kept her promises, and for all other losses that result from RPG's detrimental reliance.

**COUNT VII**
**(Declaratory Judgment)**

132.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 131 above.

133.    RPG has a tangible legal interest in enforcing the terms and provisions of the License Agreement, and Davis has an adverse legal interest with respect to enforcement of the Agreement.

134.     An actual controversy exists as to whether Davis properly terminated the License Agreement by providing notice of termination on December 28, 2007, rather than the upon the actual date specified for termination under the Agreement.

135.     This controversy is a concrete dispute admitting of immediate and definitive determination of the parties' rights, the resolution of which will aid in termination of the controversy or some part thereof.

136.     RPG is entitled to a declaratory judgment that Davis failed to terminate the License Agreement in accordance with the terms of that Agreement.

**COUNT VIII**
**(Preliminary and Permanent Injunctive Relief)**

137.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 136 above, as if set forth fully herein.

138.     RPG is likely to succeed on the merits of its claims against Davis.

139.     RPG will be irreparably harmed without the issuance of an injunction due to the actions of Davis described herein.

140.     RPG has no adequate remedy at law for the loss or threatened loss of its highly valuable confidential information and trade secrets; thus, injunctive relief is appropriate.

141.     The balance of harms favors issuing an injunction for RPG's benefit.

142.     RPG is entitled to injunctive relief.

143.     As a result of the acts described herein, RPG is entitled to recover its expenses of litigation, including reasonable attorneys' fees.

**REQUESTS FOR RELIEF**

WHEREFORE, RPG respectfully requests that this Court:

1.     Enter a temporary restraining order, followed by a preliminary and then a

permanent injunction, immediately restraining and enjoining Davis, whether directly or indirectly, alone or in concert with other persons or corporate entities until further Order of this Court, from using, disclosing or transmitting to any individual or entity, for any purpose, the following trade secrets and proprietary information of RPG (collectively, the "Confidential Information"): (a) information constituting or concerning RPG's agreements, arrangements, efforts, plans, strategies, negotiations, discussions and/or communications regarding the Signature Collection; (b) information constituting or concerning RPG's corporate operations and strategic planning, including personnel strategies, customer strategies, consumer strategies and competitive strategies; and (c) information constituting or concerning RPG's market surveys, market analysis, pricing, product development, marketing initiatives, sales techniques, customer relationships or any other proprietary information conveyed to Davis by RPG.

2.     Enter a temporary restraining order, followed by a preliminary and then a permanent injunction, immediately restraining and enjoining Davis, whether directly or indirectly, alone or in concert with other persons or corporate entities until further Order of this Court, from offering, marketing, selling, licensing, transferring or otherwise bestowing any economic or financial interest in the Signature Collection to anyone, including but not limited to American Greetings, except with the prior express written permission and consent of RPG.

3.     Enter a temporary restraining order, followed by a preliminary and then a permanent injunction, immediately restraining and enjoining Davis, whether directly or indirectly, alone or in concert with other persons or corporate entities until further Order of this Court, from interfering with or disrupting RPG's production, distribution, introduction and/or presentation of the Signature Collection for retail sale.

4.      Enter judgment declaring that Davis failed to properly terminate the License

Agreement, such that she is still bound by the provisions of that Agreement.

5.      Enter judgment on all remaining counts in favor of RPG and against Davis, and

order Davis to pay damages to RPG, including all costs, interest and attorneys' fees to which

RPG may be entitled; and

6.      Grant RPG such other and further relief as the Court deems just and equitable.

Dated: February 19, 2008                 Respectfully submitted,

                                         RECYCLED PAPER GREETINGS, INC.


                                By:      /s/ Joel W. Rice
                                         One of the Attorneys for Plaintiff

Craig R. Annunziata
Illinois Bar No. 6209487
Joel W. Rice
Illinois Bar No. 6186471
FISHER & PHILLIPS, LLP
140 South Dearborn Street
Suite 1000
Chicago, IL 60603
(312) 346-8061

Steven Manchel
MANCHEL & BRENNAN, P.C.
199 Wells Avenue, Suite 301
Newton, MA  02459
(617) 796-8920

**CERTIFICATE OF SERVICE**

I certify that a copy of the AMENDED COMPLAINT was filed electronically on this 19th day of February, 2008. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s/ Joel W. Rice